928 P.2d 843

STATE of Hawai'i, Plaintiff–Appellee,

v.

Anthony ARCEO, Defendant–Appellant.

. No. 16950.

Supreme Court of Hawai'i.

Nov. 18, 1996.

Carolyn Burton of Parton & Burton, on the briefs, Wailuku, for defendant-appellant Anthony Arceo.

Robert K. Kekuna, Deputy Prosecuting Attorney, on the briefs, Wailuku, for plaintiff-appellee State of Hawaiʻi.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

LEVINSON, Justice.

Following a jury trial, the defendant-appellant Anthony Arceo was found guilty as charged of committing one count of sexual assault in the third degree (Count One), in violation of Hawaiʻi Revised Statutes (HRS)

§ 707–732(1)(b) (1993),[1] and one count of sexual assault in the first degree (Count Two), in violation of Hawai'i Revised Statutes (HRS) § 707–730(1)(b) (1993),[2] upon his six-year-old son. Arceo appeals the judgment of conviction entered by the circuit court pursuant to the jury's verdicts.

All of Arceo's points of error on appeal stem from the decision of the State (prosecution) to aggregate multiple acts of alleged "sexual contact," *see supra* note 1, into Count One of the indictment returned against him and multiple acts of alleged "sexual penetration," *see supra* note 2, into Count Two of the indictment. Thus, Arceo urges that

the circuit court erred in: (1) refusing to require the prosecution "to elect the specific acts upon which convictions ... were being sought" as to each count, in violation of his constitutional right to a unanimous verdict implicit in the due process clause of article I, section 5 of the Hawai'i Constitution;[3] (2) "failing to instruct the jury that it must agree unanimously that [Arceo] committed the *same* specific act in reaching ... guilty verdict[s]" as to each count, likewise in violation of his constitutional right to a unanimous verdict; and (3) "refusing to exclude evidence of other crimes and bad acts," in violation of Hawai'i Rules of Evidence (HRE) Rules 403 (1993)[4] and 404(b) (1993).[5]

1. HRS § 707–732 provides in relevant part:
 **Sexual assault in the third degree.** (1) A person commits the offense of sexual assault in the third degree if:
 . . . .
 (b) The person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person[.]
 . . . .
 (2) Sexual assault in the third degree is a class C felony.
 HRS § 707–700 (1993) defines "sexual contact" to mean "any touching of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts."

2. HRS § 707–730 (1993) provides in relevant part:
 **Sexual assault in the first degree.** (1) A *person commits the offense of sexual assault in* the first degree if:
 . . . .
 (b) The person knowingly subjects to sexual penetration another person who is less than fourteen years old; provided this paragraph shall not be construed to prohibit practitioners licensed under [HRS] chapter[s] 453, 455, or 460, from performing any act within their respective practices.
 (2) Sexual assault in the first degree is a class A felony.
 HRS § 707–700 defines "sexual penetration" to mean
 vaginal intercourse, anal intercourse, fellatio, cunnilingus, anilingus [sic], deviate sexual intercourse, or any intrusion of any part of a person's body or of any object into the genital or anal opening of another person's body; it occurs upon any penetration, however slight, but emission is not required. *For purposes of this chapter, each act of sexual penetration shall constitute a separate offense.*
 (Emphasis added.)

3. Arceo has never claimed in this case that he is a medical, naturopathic, or osteopathic practitioner licensed under HRS chs. 453, 455, or 460, and, for purposes of this appeal, we assume that he is not.

3. Article I, section 5 of the Hawai'i Constitution (1978) provides in relevant part that "[n]o person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws[.]"

4. HRE 403 provides:

 **Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

5. HRE 404 (*1993*) provided in relevant part:

 **Character evidence not admissible to prove conduct; exceptions; other crimes.**
 . . . .
 (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that [the person] acted in conformity therewith. It may, however, be admissible where such evidence is probative of any other fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.
 Effective April 20, 1994, HRE 404(b) was substantively amended to add the following sentence to the existing rule:
 In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and

4

The prosecution counters that, "because sexual assault is a continuing offense," (1) it was not obligated "to elect an incident of sexual abuse upon which to rely" in order to prove each of the counts charged in the indictment, and (2) the trial court was not obligated to give a "special unanimity instruction" to the jury. Accordingly, the prosecution concludes that Arceo's "due process rights were not violated[.]" The prosecution does not respond directly to Arceo's point of error implicating HRE 403 and 404(b).

For the reasons discussed below, we vacate Arceo's judgment of conviction and remand the matter to the circuit court for a new trial.

## I. BACKGROUND

In December 1989, Arceo transported his six-year-old son ("the Minor") from San Diego, California (their home at the time) to the County of Maui. Arceo claimed to have had an acquaintance who lived on the island, but, upon arrival, he discovered that the individual no longer resided at the address with which he had been provided. Arceo was directed to the Puʻunēnē Homeless Shelter [hereinafter, "the shelter"], where he and the Minor obtained temporary housing.

At the shelter, they lived in a designated area—demarcated by suspended sheets, curtains, or blankets for privacy—that contained a single bed for the two to share. The shelter provided showers that were shared in common by the occupants. Arceo and the Minor customarily showered together because, according to Arceo, the Minor "was a very young boy," did not "know how to take [a] shower yet by himself," and Arceo "had to scrub medicated shampoo in [the Minor's] hair to take off the bugs and fleas" and was "teaching him how to do ... this personal hygiene." Thus, according to Arceo, he would "wash [the Minor's] entire body down, cleaning him." [6]

The Minor alleged that, during his time spent at the shelter, Arceo engaged in a variety of sexual acts with him. Specifically, the Minor claimed that Arceo: (1) twice inserted his finger into the Minor's "butt" while the Minor was taking a shower; (2) inserted his penis into the Minor's "butt" while the Minor was sleeping on the bed provided by the shelter; (3) twice performed

general nature of any such evidence it intends to introduce at trial.
1994 Haw.Sess.L.Act 25, § 1 at 114. Section 2 of Act 25 provided that the amendment did "not affect rights and duties that matured, penalties that were incurred, and proceedings that were begun, before its effective date" and therefore does not affect the present appeal. Act 25 effected an additional cosmetic change to HRE 404(b) that is also immaterial to the present appeal.

6. By virtue of its guilty verdicts, Arceo's consistent denial that he had engaged in any sexual improprieties with the Minor was obviously rejected by the jury. Nevertheless, we note that the December 28, 1994 Final Report of the Committee to Conduct a Comprehensive Review of the Hawaiʻi Penal Code, mandated by 1993 Haw. Sess.L., Act 284, § 2 at 525–26, recommended, *inter alia*, that the legislature enact a new section—HRS § 707–733.5—to be incorporated into chapter 707, part V. (relating to sexual offenses) of the Hawaiʻi Penal Code. Section 707–733.5 would provide:

**Medical and parental exemptions.** Sections 707–730, 707–731, 707–732, and 707–733 shall not be construed to prohibit practitioners licensed under chapter 453, 455, or 460, or their authorized agents, from performing any lawful act within their respective practices *nor to prohibit parents*, guardians, or designated custodians *from performing lawful acts involving duties or responsibilities which are taken for the health or welfare of the child under their care.*
Final Report at 132 (emphases added). The comment accompanying the proposed legislation provides in relevant part:

The medical practitioners exemption is presently found in three subsections of the sexual assault laws, and arguably should be inserted in additional subsections. The parental exemption is needed for the same reasons. The reasons are that both of these groups of caretakers come into legitimate contact with the private parts of their wards[ ] and that the definitions of "sexual contact" and "sexual penetration," see § 707–700, are broad enough to reach some of these legitimate touchings. Rather than clutter up individual subsections with these exemptions, the committee thought it preferable to propose a single statute, § 707–733.5, and make it generally applicable to the sexual assault provisions. Notice that the exemptions are limited to "lawful acts," that the practitioners' acts must be "within their respective practices," and that the parental acts must be "taken for the health or welfare of the child under their care."
*Id.* at 132–33. To date, the legislature has not acted on the committee's recommendation.

fellatio upon the Minor; (4) placed his penis on the Minor's penis while the Minor was on the bed; and (5) placed his penis on the Minor's back while the Minor was either on the bed or the floor of the "bedroom."

In May 1990, an officer of the Maui Police Department, who was responding to a communication from the San Diego District Attorney's Office, took protective custody of the Minor at the Kahului Elementary School and deposited him into the care of the Child Protective Services (CPS) arm of the State of Hawai'i Department of Human Services. CPS then returned the Minor to his mother in San Diego. On June 15, 1990, the Minor was interviewed by a social worker in the employ of the Center for Child Protection of the San Diego Children's Hospital.

On July 24, 1992, the Maui grand jury returned an indictment against Arceo, which charged him as follows:

*COUNT ONE:*

That during the period between August 16, 1989, to May 4, 1990, in the County of Maui, State of [Hawai'i], ANTHONY AR-CEO did knowingly subject [the Minor], a person less than fourteen (14) years old, to sexual contact or cause [the Minor] to have sexual contact with him, thereby committing the offense of Sexual Assault in the Third Degree in violation of Section 707–732(1)(b) of the [Hawai'i] Revised Statutes.

*COUNT TWO:*

That during the period between August 16, 1989, to May 4, 1990, in the County of Maui, State of [Hawai'i], ANTHONY AR-CEO did knowingly subject to sexual penetration another person, to wit, [the Minor], who was less than fourteen (14) years old, thereby committing the offense of Sexual Assault in the First Degree in violation of Section 707–730(1)(b) of the [Hawai'i] Revised Statutes.

On January 4, 1993, in anticipation of the commencement of trial the following week, Arceo filed a motion in limine, which sought an order from the circuit court "excluding evidence regarding [Arceo's] prior bad acts under [HRE] 403 and 404(b)[.]" Attached to the motion in limine was an affidavit of defense counsel, which averred in relevant part:

5. After reviewing the Grand Jury transcript[,] Affiant has identified as least nine (9) alleged sexual assaults to which [the Minor] testified;

6. Affiant has reviewed the Indictment and only two counts of sexual assault are charged;

7. It would be unfair to [Arceo] if the [prosecution] did not specify the two incidents charged in the Indictment and to exclude reference to all others[.]

In addition, Arceo's memorandum in support of the motion in limine advanced, *inter alia,* the following argument:

Count One of the Indictment charges [Arceo] with Sexual Assault in the Third Degree and Count Two charges him with Sexual Assault in the First Degree. Both of these offenses allegedly occurred between August 16, 1989 and May 4, 1990. The [Minor] testified at the ... Maui Grand Jury hearing wherein he made at least nine separate allegations of sexual abuse by his father. These allegations were: "He put his finger in my bottom"; "he put his fingers on my penis"; "he put his fingers on my butt ... in my butt"; "he put his mouth on my penis".... Upon further encouragement from the prosecutor, [the Minor] also said [that Arceo] put his finger inside [the Minor's] butt "more than once", "in the room and sometimes inside the shower".... [The Minor] also said [that Arceo put his penis "on my penis", "more than once" ...; "sometimes on the bed and sometimes on the floor" ...; "sometimes in the day and sometimes night".... [The Minor] also said [that Arceo] put his penis in [the Minor's] butt "more than once", sometimes "in the room"; sometimes "in the shower".... Also, [the Minor] said [that Arceo] put his mouth on [the Minor's] penis, "more than once"....

The [prosecution] has somehow sifted through all of these allegations and charged [Arceo] with having sexual contact with his son (Count One) and subjecting him to sexual penetration (Count Two). *It is not clear which two particular incidents alleged above form the bases for the charges.* All of the other alleged bad acts

should be excluded under [HRE] Rules 403 and 404(b)[.]

(Emphasis added.)

The prosecution filed a memorandum in opposition to Arceo's motion in limine on January 7, 1993, which contained the following argument and representations:

[Arceo] does not seek greater specification of the alleged dates and times of the sexual offenses charged in order to prepare a defense or to avoid double jeopardy. To meet any concerns of double jeopardy, however, the [prosecution] will stipulate that *the present indictment covers all alleged sexual assaults [plural] of the [M]inor by [Arceo] during the specified period while they were living on Maui.*

However, [Arceo] seeks only to limit the evidence to two specified occurrences, presumably so that the jury will not learn the full extent of [Arceo's] crime [singular]. The [prosecution] asserts that[,] in this case, [Arceo] has failed to show a defect in the charge or any prejudice that would justify granting his motion, and[,] further, that given the age of the minor complainant and *the continuing nature of the offense* [singular], there is good reason for denying [Arceo's] motion.

. . . .

Minors can rarely be expected to recall the specific date, time, and details of repeated sexual offense. . . . Accordingly, it has been held that where a defendant is accused of a sexual offense involving a minor, it is not necessary that a specific date for the offense be given because the time of the offense is not considered an indispensable ingredient of the offense. It is sufficient under such a charge that the time of the offense be given with as much particularity as possible under the circumstances based on the information available to the prosecution[,] provided that the time stated be within the statute of limitations. [Citations omitted.]

*The instant motion appears to be designed to limit the [prosecution's] proof of a continuing offense* [singular]. . . .

An order granting the motion is unwarranted and would unduly restrict the [prosecution's] presentation of the evidence at trial. *The Court's options* to that extremely unreasonable remedy *would be to permit amendment of the indictment to eight or nine distinct charges,* pursuant to [HRS § ] 806–46,[7] *or to permit a dismissal without prejudice so that the [prosecution] may reindict [Arceo] on eight or nine distinct felonies,* as apparently suggested by defense counsel's motion.

. . . Clearly, *the [prosecution] may charge (and has charged) [Arceo] with two continuous offenses based on repeated acts occurring over a period of time. [Arceo] essentially engaged in two continuous offenses, sexual contact with a minor and sexual penetration of a minor.* "[T]he applicable test in determining whether there is a continuing crime 'is whether the evidence discloses one general intent or discloses separate and distinct intents'. . . . [I]f there is but one intention, one general impulse, and one plan, even though there is a series of transactions, there is but one offense." *State v. Martin,* 62 Haw. 364, 368, 616 P.2d 193 (1980). *The evidence herein, consisting of repeated sexual touching and/or penetration, disclose but one general intent. While the [prosecution] might have charged each act as a separate offense, the [prosecution] was as well entitled to charge the acts as a continuing offense.* The alternative—charging [Arceo] with eight or nine separate offenses—would actually prejudice [Arceo] by subjecting him [to] enhanced sentencing in the event of conviction.

---

7. HRS § 806–46 (1993) provides:

**Objections to indictment.** Every objection to any indictment for any defect apparent on the face thereof, shall be taken by demurrer or motion to quash the indictment before the accused has pleaded and not afterwards; and every court before which any such objection is taken for the defect may, if it is thought necessary, cause the indictment to be forthwith amended in that particular by some officer of the court or other person, and thereupon the trial shall proceed as if no defect had appeared; and no motion in arrest of judgment shall be allowed for any defect in any indictment which might have been taken advantage of by demurrer or motion to quash as aforesaid.

(Some ellipsis points and brackets in original and some added.) (Emphases added.)

The circuit court conducted a hearing on Arceo's motion in limine on January 11, 1993, immediately before the commencement of trial. In the course of the hearing—at the conclusion of which the circuit court denied Arceo's motion in limine—the following colloquy transpired among the deputy prosecuting attorney (DPA), defense counsel, and the circuit court:

THE COURT: ... As I understand it, Ms. [DPA], insofar as the motion is addressed to other acts during the period in the indictment[,] the [prosecution's] offer of proof is that various kinds of conduct— contact[,] I should say, occurred. That the child will testify that they occurred more than once [and] that he is not able to be any more specific as regarding when?

[DPA]: That's correct, [Y]our Honor.

THE COURT: Further that the [prosecution] is stipulating that an order may be entered that no other acts may be prosecuted during the period of the indictment.

[DPA]: That's correct, [Y]our Honor.

THE COURT: Anything else for the record on that?

[DEFENSE COUNSEL]: Yes. Your Honor, for the record[,] I would like to object to any acts being brought into evidence which do not direct themselves to the two counts listed in the indictment. *It's clear that sexual abuse is not an ongoing offense. It's not a continuing offense. Even the law makes it clear that, for example, in sexual penetration under [HRS § ] 707–700[,] it says for purposes of this chapter[,] each act of sexual penetration shall constitute a separate offense.*

The grand jury transcript not only shows that the [Minor] said that these incidents happened more than once, he described different types of penetration. One type of penetration was penile penetration into his anus. Another was digital penetration to his anus. Same as with touching. There were three or four different times [sic, presumably types] of touch. One[,] mouth on the penis. Penis on his back. Penis on penis.

All of these are separate allegations which are not just the [Minor] saying [Arceo] touched me [on] four different occasions in the same way or he penetrated me on more than one occasion in the same manner.

So, I think, [Y]our Honor, *we're only asking that the prosecution be able to offer evidence which goes to prove its case against those two counts in the indictment. And since clearly sexual abuse[,] in this context, is not an ongoing offense, the [prosecution] should be precluded from bringing in reference[s] to all these other alleged incidents that happened[,] both [pursuant to] Rule 403, [Rule] 404(b), and the due process [violation] of having a banquet of offenses and we kind of have to guess which ones they're going· to charge. And the jury will have the same problem[,] saying, well, if all the testimony comes in[,] [Arceo] must have done something, so we just convict him. So we think that the [prosecution] should have to conform its evidence to the two counts listed in the indictment.*

THE COURT: My understanding is[,] at the time of the offenses, your offer of proof is, [the Minor] was how old?

[DPA]: He was six and seven years old.

THE COURT: That he was unable to be more specific as to the time[,] and he can't be specific as to the number of occasions [—] only that they are more than once.

[DPA]: That's correct.

. . . .

[DEFENSE COUNSEL]: I'd like to make one more point that [the Minor] testified on two different occasions that there were 12 separate instances. He was very specific about that.

THE· COURT: I'm going to deny the motion. . . .

(Emphases added.)

At trial, the Minor, then nine years old, testified regarding the alleged sexual acts that occurred while living at the shelter. On direct examination, he and the DPA engaged in the following exchange:

[DPA]: Now, [Minor], how did you like living at the shelter?

8

[MINOR]: Not much.

Q. Why not?

A. My Dad done things to me.

Q. Your Dad done things to you? Did he do things that you liked or didn't like?

A. Didn't like.

Q. What kind of things . . . did he do?

A. He stuck his finger in my butt and he put his penis on mine and he put his penis in my butt and my back.

Q. Okay, now. . . . Do you remember, can you remember certain times that things happened? Can you remember where things happened?

A. Yes.

Q. Okay. . . . Can you tell us where at the shelter you would get touched in a way you didn't like by your Dad?

A. The room and the showers.

Q. Is that the room that you were living in?

A. Yes.

. . . .

Q. . . . Now, you've now made a circle around the showers where you say your Dad touched you in a way you didn't like. Now, what happened in the shower that you remember?

A. Put his finger in my butt.

Q. When did that happen?

A. When I was washing my hair.

Q. . . . [W]ere you taking a bath with Dad?

A. One time and the other not.

. . . .

Q. Okay, [Minor], you say you were washing yourself. What do you remember happened?

A. I was bending down to wash my hair and he came and put his finger in my butt.

. . . .

Q. And how many times did that happen, do you remember the number of times that happened?

A. No.

Q. Did it happen once or more than once?

A. Twice I think.

Q. Okay. Did it happen twice in the showers?

A. Yes, I think.

Q. Do you remember the other time—what is the other time you're thinking of?

A. In the showers too.

Q. Okay. Now did you tell anybody about that?

A. No.

Q. How come?

A. I was scared.

Q. Scared of what?

A. If I did my Dad would hit me.

Q. Had he hit you when you were at the shelter?

A. Yes.

. . . .

Q. Okay. Now, do you remember other times, other places where your Dad touched you at the shelter?

A. The bedroom.

. . . .

Q. Where in the bedroom did that happen?

A. In the bed.

Q. . . . [A]nd would that be in the day or the night?

A. Evening and the night.

Q. Did it happen once or more than once?

A. I think once.

Q. One time?

A. Maybe.

Q. Okay. What do you mean maybe?

A. Maybe it's more or maybe it's once.

Q. Were you counting the times that things happened?

A. I don't remember.

Q. Do you remember what happened though?

A. Yes.

Q. Tell us what you remember happening in the bedroom?

A. Put his penis in [sic] my penis.

Q. He put his penis on your penis and—

A. And my back.

Q. Where were you at the time? What part of the room?

A. In the bed.

. . . .

Q. Okay. When he put his penis on your penis what did he do?

A. Made it go up and down.

Q. Made what go up and down?

A. His body.

. . . .

Q. Now, you said that he put his penis in your butt?

A. Yes.

Q. Where did that happen, [Minor]?

A. When I was sleeping on the bed.

Q. Okay. And what did you feel?

A. His penis.

Q. Okay. And how do you know it was his penis?

A. Felt like it.

Q. How did it feel?

A. Soft.

Q. When you say soft, what do you mean?

A. Squishy.

Q. What part of you did it touch?

A. My butt.

Q. Okay. Was it on the outside of your butt or the inside of your butt?

A. Halfway.

Q. Halfway where?

A. In my butt.

Q. Okay. You know when you have a butt, does your butt have a hole also?

A. Yes.

Q. Did it go in the hole?

A. Halfway.

Q. You felt it go in?

A. Yes.

. . . .

Q. Do you remember you said that Daddy's penis touched you on the back?

A. Yes.

Q. Do you remember where that happened?

A. On the floor I think.

Q. On the floor?

A. Or on the bed.

Q. Can you remember really, really good?

A. I think it was on the bed.

Q. What do you remember when your Daddy's penis touched your back?

A. When I woke up it was on my back.

Q. When you woke up in the morning?

A. Yes.

. . . .

Q. Did he ever touch you with his mouth?

A. Yes.

Q. He did? Where did he touch you with his mouth?

A. On my penis.

Q. Did he do that once or more than once?

A. Twice, I think.

Q. Okay, twice. Were your clothes on or off?

A. Sometimes off.

Q. Now, what do you remember about how Daddy touched you with his mouth on your penis?

A. He made it go up and down.

Q. What did he make go up and down?

A. His mouth.

Q. [N]ow did you ever see Daddy's penis?

A. Yes.

Q. During any of these times when he was touching you, doing things, did you see his penis?

A. Yes.

Q. How did it look?

A. Slimy, like egg like [sic] on it.

Q. Egg white on it?

A. Yeah, and eggs like scrambled.

. . . .

Q. Is that something you would see come on his penis or come out of it?

A. Come out of it.

. . . .

Q. Now, [Minor], how does it make you feel to talk about this?

A. Scared.

Q. Do you like telling about this in court?

A. No.

Q. Okay. Before coming to court did you spend a lot of time trying to remember everything or trying to forget it?

A. Sometimes, um, we went to counseling to forget about it.

Q. You went to counseling to forget about it?

A. Yeah.

Q. Did that counseling help you?

A. Yes.

Q. When you were at the shelter did you tell people Daddy was doing these things?

A. No.

Q. What did you think would happen if you told people?

A. Hit me.

Q. When you were at the shelter did you know where your Mom was?

A. No.

. . . .

Q. . . . [A]ll the time you were here on Maui living at the shelter, did you ever see or hear from Mom?

A. No.

: . . .

Q. When you got on the airplane where did you think you were going?

A. I think to see my Mom.

Q. How did you feel about that?

A. Happy.

Q. Did you feel sad or upset to be leaving your Dad?

A. No.

Q. Why not?

A. Because he done that things to me and I don't want it to happen again.

On cross-examination, the Minor acknowledged that he recalled telling Detective Rojas of the Maui Police Department that his father had touched him approximately twelve times, but that, at trial, he could only guess as to the number of separate instances because he could not presently remember. He further conceded that he had a difficult time remembering what had happened three years ago.

Testifying in his own defense, Arceo denied the Minor's allegations of sexual abuse. He insisted that he had (1) touched the Minor in the shower only in the course of teaching him how to clean himself, (2) never intentionally penetrated the Minor's anus in the shower with his finger, (3) never penetrated the Minor's anus with his penis in the shower, the bedroom, or anywhere else, and (4) never intentionally touched the Minor at night when they shared the bed in the shelter.

Following the close of the evidence and the final arguments of counsel, the circuit court instructed the jury. Instruction No. 26, given by agreement of the parties, directed in relevant part that "[a] verdict must represent the considered judgment of each juror, and in order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdict must be unanimous." Instruction No. 28, also given by agreement of the parties, advised in relevant part that, "[a]s to each count, . . . your verdict must be unanimous." Arceo did not request, nor did the circuit court give, an instruction advising the jury that, in order to convict him of either charged offense, all twelve of its members were required to find beyond a reasonable doubt that Arceo committed the same underlying act constituting the "conduct" element of the charged offense.

At the conclusion of its deliberations, the jury found Arceo guilty of both charged offenses. Arceo's timely appeal followed.

## II. STANDARDS OF REVIEW

### A. Statutory Interpretation

"The interpretation of a statute is a question of law reviewable de novo." State v. Camara, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citation omitted). See also State v. Aluli, 78 Hawai'i 317, 320, 893 P.2d 168, 171 (1995) (citation omitted).

## B. *Evidentiary Rulings*

[D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard.

*Kealoha v. County of Hawaii*, 74 Haw. 308, 319, 844 P.2d 670, 676, *reconsideration denied*, 74 Haw. 650, 847 P.2d 263 (1993). Where the evidentiary ruling at issue concerns admissibility based upon relevance, under . . . [HRE] Rules 401 and 402, the proper standard of appellate review is the right/wrong standard. *See State v. Toro*, 77 Hawai'i 340, 347, 884 P.2d 403, 410 (Haw.Ct.App.), *cert. denied*, 77 Hawai'i 489, 889 P.2d 66 (1994).

*State v. Kupihea*, 80 Hawai'i 307, 314, 909 P.2d 1122, 1129 (1996) (some brackets in original and some added). "Evidentiary decisions based on HRE Rule 403, which require a 'judgment call' on the part of the trial court, are reviewed for an abuse of discretion." *Walsh v. Chan*, 80 Hawai'i 212, 215, 908 P.2d 1198, 1201 (1995) (citing *Sato v. Tawata*, 79 Hawai'i 14, 19, 897 P.2d 941, 946 (1995)). "HRE 404 represents a particularized application of the principle of HRE 403 (*see* Commentary to HRE 404), and we will employ the same abuse of discretion standard of review." *State v. Alston*, 75 Haw. 517, 538, 865 P.2d 157, 168 (1994) (brackets and internal quotation marks omitted). " 'The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.' " *State v. Ganal*, 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996) (quoting *State v. Furutani*, 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994)).

## C. *Constitutional Questions*

Whether a defendant is denied due process of law by virtue of the trial court's refusal to require the prosecution to elect the particular act on which it is relying in seeking a criminal conviction of a charged offense presents a question of constitutional law. We answer questions of constitutional law "by exercising our own independent constitutional judgment based on the facts of the case." *State v. Trainor*, 83 Hawai'i 250, 255, 925 P.2d 818, 823 (1996) (citation and internal quotation marks omitted); *State v. Lee*, 83 Hawai'i 267, 273, 925 P.2d 1091, 1097 (1996) (citation, internal quotation marks, and brackets omitted). Thus, we review questions of constitutional law under the "right/wrong" standard. *See State v. Toyomura*, 80 Hawai'i 8, 15, 904 P.2d 893, 900 (1995) (citing *State v. Higa*, 79 Hawai'i 1, 3, 897 P.2d 928, 930 (1995), and *State v. Gaylord*, 78 Hawai'i 127, 137, 890 P.2d 1167, 1177 (1995)); *State v. Baranco*, 77 Hawai'i 351, 355, 884 P.2d 729, 733 (1994) (issue whether defendant's constitutional right against double jeopardy would be violated unless indictment dismissed is question of law, reviewed under right/wrong standard); *In re Doe, Born on January 5, 1976*, 76 Hawai'i 85, 93, 869 P.2d 1304, 1312 (1994) (whether speech is protected by first amendment to United States Constitution as applied to states through fourteenth amendment and by article I, section 4 of Hawai'i Constitution are questions of law freely reviewable on appeal).

## D. *Omission Of Jury Instructions*

" 'When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.' " *State v. Kinnane*, 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995) (quoting *State v. Kelekolio*, 74 Haw. 479, 514–15, 849 P.2d 58, 74 (1993) (citations omitted)). . . . *See also State v. Hoey*, 77 Hawai'i 17, 38, 881 P.2d 504, 525 (1994).

" '[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.' " *State v. Pinero*, 70 Haw. 509, 527, 778 P.2d 704, 716 (1989) . . . (quoting *Turner v. Willis*, 59 Haw. 319, 326, 582 P.2d 710, 715 (1978)).

[E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.

*State v. Heard,* 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted). If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside. *See Yates v. Evatt,* 500 U.S. 391, 402–03 . . . (1991)[.]

*State v. Holbron,* 80 Hawai'i 27, 32, 904 P.2d 912, 917, *reconsideration denied,* 80 Hawai'i 187, 907 P.2d 773 (1995) (some citations omitted) (brackets in original) (emphasis deleted); *see also State v. Loa,* 83 Hawai'i 335, 350, 926 P.2d 1258, 1273 (1996); *State v. Robinson,* 82 Hawai'i 304, 310–11, 922 P.2d 358, 364–65 (1996).[8]

## III. DISCUSSION

### A. Sexual Assault In The First Degree, In Violation Of HRS § 707-730(1)(b), And Sexual Assault In The Third Degree, In Violation Of HRS § 707-732(1)(b), Are Not "Continuing Offenses."

■ The mutually exclusive positions advanced by the parties in this appeal generate a threshold question, namely, whether (as the prosecution maintains) Arceo's alleged "repeated acts occurring over a period of time" could be aggregated into a two-count indictment—organized generically into clusters of acts each comprising a distinct instance of the same statutory offense—on the basis that Arceo "essentially engaged in two continuous offenses, sexual contact with a minor and sexual penetration of a minor." *See supra* at 5, 928 P.2d at 848. In order to answer the question, we must analyze the elements of the offenses with which Arceo was charged and of which he was convicted, *see supra* notes 1 and 2, determine—within the context of the statutory scheme created by the Hawai'i Penal Code (HPC)—whether it is possible for them to be "continuing," and, finally, consider the potential ramifications of treating them as such.

### 1. Elements of the offenses

#### a. General principles

Pursuant to HRS § 702-205 (1993), the "elements of an offense" are defined as such conduct,[9] attendant circumstances, and results of conduct as are (1) specified by the statutory definition of the offense and (2) negative a defense on the merits (*i.e.,* a defense "other than one based on the statute of limitations, lack of venue, or lack of jurisdiction"). *See* commentary on HRS § 702-205.

---

**8.** *People v. Van Dorsten,* 441 Mich. 540, 494 N.W.2d 737 (1993), upon which the dissenting opinion relies at 35–36, 928 P.2d at 877–878 for the proposition that an erroneous jury instruction is "harmless" if "the defendant never objected to" it or "requested his own instruction," is directly contrary to the foregoing harmless error analysis and is therefore inapposite. Indeed, "it is of no consequence," for purposes of ascertaining whether the giving of a particular jury instruction constitutes harmful error, "that the trial court gave [it] at [the defendant's] request," *Loa,* 83 Hawai'i at 358, 926 P.2d at 1281, much less that the defendant failed to request it, *see State v. Kupau,* 76 Hawai'i 387, 392–96, 879 P.2d 492, 497–501 (1994). Accordingly, we have long since parted company with the view expressed in *State v. Covington,* 711 P.2d 1183, 1184–85 (Alaska.Ct.App.1985), cited at 35, 928 P.2d at 877 of the dissenting opinion, that, in the absence of an objection to an erroneous jury instruction, an appellate court should apply "a standard more stringent than the harmless beyond a reasonable doubt test applied to determine harmless error in cases where errors of constitutional dimension are preserved for appeal by timely objection."

**9.** HRS § 701-118(4) (1993) defines "conduct" to mean "an act or omission, or, *where relevant,* a series of acts or a series of omissions, or a series of acts and omissions[.]" (Emphasis added.) Thus, a discrete offense may consist of "a series of acts" when "[t]he offense is *defined* as a continuing course of conduct" that is "uninterrupted," as distinguished from statutes providing "that specific periods of conduct constitute separate offenses." HRS § 701-109(1)(e) (1993) (emphasis added). *See also* HRS § 701-108(4) (1995) ("An offense is committed either when every element occurs, or, if a legislative purpose to prohibit a *continuing course of conduct* plainly appears, at the time when the *course of conduct* . . . is terminated. . . ." (Emphases added.)).

In general, the precise time and date of the commission of an offense is not regarded as a material element. Accordingly, this court "has long recognized that, in cases involving sexual abuse of minors, it is sufficient, in the indictment, to allege that the offense occurred over a particular time span[.]" *State v. Sherman*, 70 Haw. 334, 339, 770 P.2d 789, 792 (1989) (citing *Territory v. Low*, 35 Haw. 571 (1940), and *Territory v. Izumi*, 34 Haw. 209 (1937)). In this regard, *Low*, 35 Haw. at 578, expressly reaffirmed the general rule, which was first enunciated in *Territory v. Crawford*, 18 Haw. 246, 247 (1907):

> Ordinarily the time of the commission of an offense must be specifically alleged, but unless it is of the essence of the offense it need not be proved as alleged; it is sufficient to allege any time within the statute of limitations and before the finding of the indictment and to prove any* other time within that period. If, however, the time is of the essence of the offense it must be proved in so far as it is of the essence. For instance, if the offense is driving without lights during the hours of darkness it must be both alleged and proved to have been committed during such hours, although it is sufficient to prove that it was during any such hour even though different from the particular hour, if any, alleged. Similarly, if the offense is a violation of a Sunday law, its time must be alleged as on Sunday, but it is sufficient to prove that it was on some other Sunday than the one alleged.

*See also* HRS § 806–27 (1993) ("No indictment shall be held invalid or insufficient for want of the averment of any matter unnecessary to be proved[.]"); HRS § 806–34 (1993) ("In an indictment[,] the offense ... may be stated with so much detail of *time*, place, and circumstances and such particulars ... as are necessary to identify the transaction, to bring it within the statutory definition of the offense charged, to show that the court has jurisdiction, and to give the accused reasonable notice of the facts." (Emphasis added)); Hawai'i Rules of Penal Procedure (HRPP) Rule 7(d) ("The charge shall be a plain, concise and definite written statement of the essential facts constituting the offense

charged.... The charge need not contain ... any ... matter not necessary to such statement....").

Our view in this regard appears to represent the preponderant position among the various jurisdictions. For example, in *People v. Jones*, 51 Cal.3d 294, 270 Cal.Rptr. 611, 792 P.2d 643 (1990), the California Supreme Court articulated the following paradigm, with which we agree:

> Does the victim's failure to specify precise date, time, place or circumstance render generic testimony insufficient? Clearly not. As many of the cases make clear, the particular details surrounding a child molestation charge are not elements of the offense and are unnecessary to sustain a conviction.
>
> The victim, of course, must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g. lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., "twice a month" or "every time we went camping"). Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., "the summer before my fourth grade," or "during each Sunday morning after he came to live with us") to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction.

*Jones*, 270 Cal.Rptr. at 623–24, 792 P.2d at 655–56 (citations omitted) (emphasis in original). *See also Covington v. State*, 703 P.2d 436, 440 (Alaska.Ct.App.1985) ("While we agree with the [prosecution's] authorities that an indictment is sufficient which charges a specific incident, the precise date of which the witness is uncertain, the witness must nevertheless have a specific incident in

mind."); *Thomas v. People*, 803 P.2d 144, 152 (Colo.1990) ("The prosecution need not specify the exact date the offense took place, but it must specify a particular act." (Citing *Laycock v. People*, 66 Colo. 441, 182 P. 880, 881 (1919).)); *State v. Roberts*, 101 Idaho 199, 610 P.2d 558, 559 (1980) ("Since time is not a material ingredient in the offense ..., the information need only be specific enough to enable the defendant to prepare his defense and to protect him from being subsequently prosecuted for the same offense. Any other rule would too often preclude prosecutions in this type of case where the victims are minors and where the crimes are not discovered until some time after their commission." (Citations omitted.)); *State v. Clark*, 209 Mont. 473, 682 P.2d 1339, 1344–45 (1984) (holding that, inasmuch as "time is not a material ingredient in statutory rape," an amended information charging defendant with sexual intercourse without consent with his minor stepdaughter, and alleging in each count that offense charged occurred during certain week, or period of several weeks, stated time and place of charged offenses as definitely as could be done under circumstances of case and thus was sufficient in that regard).

Notwithstanding that, as a general rule, the precise time and date of the commission of any given offense is not a material element of the offense within the framework of the HPC,

> HRS § 701–114(1)(a) and (b) (1993) requires proof beyond a reasonable doubt of each element of the offense, as well as the state of mind required to establish each element of the offense. Moreover, HRS § 702–204 (1993) provides in relevant part that "a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies with respect to each element of the offense." ... HRS § 702–207 (1993) provides that "[when] the definition of an offense specifies the state of mind

sufficient for the commission of that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears." In addition, pursuant to HRS § 702–205 ..., the requisite state of mind applies to such conduct, attendant circumstances, and results of conduct as are specified by the definition of the offense.

*State v. Wallace*, 80 Hawai'i 382, 412, 910 P.2d 695, 725 (1996) (quoting *Holbron*, 80 Hawai'i at 39, 904 P.2d at 924) (some ellipsis points in original and some added) (brackets in original).

### b. Sexual assault in the first degree (Count Two)

A person (who is not a health care practitioner, licensed under HRS chs. 453, 455, or 460, performing an act within his or her respective practice, *see supra* note 2) commits the offense of sexual assault in the first degree, in violation of HRS § 707–730(1)(b), if the person knowingly subjects to sexual penetration another person who is less that fourteen years old.

Accordingly, there were three material elements of the offense of sexual assault in the first degree as charged in Count Two of the indictment against Arceo, each of which the prosecution was required to prove beyond a reasonable doubt in order to establish guilt. These three material elements were: (1) that Arceo subjected the Minor to sexual penetration (*i.e.*, the prohibited conduct, to wit, anal intercourse, fellatio, or the intrusion of Arceo's finger into the Minor's anal opening, *see supra* note 2); (2) that Arceo was aware that he was doing so (*i.e.*, the requisite knowing state of mind with respect to the actor's conduct);[10] and (3) that the Minor was less than fourteen years old at the time of the sexual penetration (*i.e.*, the attendant circumstance of the Minor's age, *see supra* note 2).[11]

---

10. HRS § 702–206(2)(a) (1993) provides that "[a] person acts knowingly with respect to his conduct when he is aware that his conduct is of that nature."

11. HRS § 702–206(2)(b) (1993) provides that "[a] person acts knowingly with respect to at-

tendant circumstances when he is aware that such circumstances exist." This court, however, has recently held, by a three-to-two majority, that "a defendant is strictly liable with respect to the attendant circumstance of the victim's age in a sexual assault." *State v. Buch*, 83 Hawai'i 308, 316, 926 P.2d 599, 607 (1996). Accordingly, it is

### c. Sexual assault in the third degree (Count One)

A person commit the offense of sexual assault in the third degree, in violation of HRS § 707–732(1)(b), if the person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person.

Accordingly, there were four material elements of the offense of sexual assault in the third degree as charged in Count One of the indictment against Arceo, each of which the prosecution was required to prove beyond a reasonable doubt in order to establish guilt. These four material elements were: (1) that Arceo subjected the Minor to sexual contact (*i.e.*, the prohibited conduct, to wit, the touching of the Minor's back with Arceo's penis or the touching of the Minor's penis with Arceo's penis, *see supra* note 1); (2) that Arceo was aware that he was doing so (*i.e.*, the requisite knowing state of mind with respect to the actor's conduct, *see supra* note 10); (3) that Arceo was aware that the Minor was not married to him (*i.e.*, the requisite knowing state of mind with respect to the attendant circumstance implicit in "sexual contact," *see supra* notes 1 and 11); and (4) that the Minor was less than fourteen years old at the time of the sexual contact (*i.e.*, the attendant circumstance of the Minor's age, *see supra* note 1).[12]

### 2. Multiple sexual assaults, "continuing offenses," and the conceptual framework established by the HPC.

#### a. The competing constructs

The case law of certain jurisdictions contains language suggesting that, under certain circumstances, a *series* of distinct sexual assaults committed against a minor may constitute a *single* "continuing" offense. *See, e.g., People v. Cooks,* 446 Mich. 503, 521 N.W.2d 275, 286 (1994); *Huddleston v. State,* 695

P.2d 8, 10–11 (Okla.Crim.App.1985); *Clark,* 682 P.2d at 1344.

In *Cooks,* the defendant was convicted of a single count of "second degree criminal sexual conduct," notwithstanding that "testimony elicited from the [ten-year-old] complainant at trial referred to three incidents of sexual penetration." 521 N.W.2d at 276. The Michigan Court of Appeals vacated the conviction "because the trial court refused to instruct the jurors that unanimous agreement about a specific act of penetration [was] required for conviction." *Id. See* section III. C.2. of this opinion, *infra.* "Because materially identical evidence was offered with respect to each of the alleged acts of penetration and there [was] no reason to believe the jury was confused or disagreed about the basis of [the] defendant's guilt," a majority of the Michigan Supreme Court reversed the decision of the Court of Appeals and held that the trial court had not erred. 521 N.W.2d at 276.

In the course of its analysis, the *Cooks* majority noted that "the evidence offered in this case to support each of the alleged acts of penetration was materially identical, i.e., the complainant's equivocal testimony of an anal penetration, occurring in the same house over an unspecified three-day period ..., while only she and [the] defendant were in the room." *Id.* at 286 (footnote omitted). On this basis, the *Cooks* majority expressed the view that "the multiple acts alleged by the prosecutor were tantamount to a continuous course of conduct." *Id.* By contrast, Justice Levin argued in dissent that

[t]he continuous conduct exception only applies to those offense[s] where the statute defining the crime may be interpreted as applying to an offense that may be continuous in nature, such as failure to provide, contributing to the delinquency of a minor, driving under the influence, concealing stolen property, and criminal acts of possession.

---

not an element of the offense of sexual assault in the first degree as charged in Count Two of the indictment that Arceo was aware that the Minor was less than fourteen years old at the time.

**12.** It is not an element of the offense of sexual assault in the third degree as charged in Count One of the indictment that Arceo was aware that the Minor was less than fourteen years old at the time. *See supra* note 11.

*Multiple sex acts do not merge into a single continuing offense because the defendant can be convicted and punished for each separate act.*

*Id.* at 288 n. 4 (emphasis added). In support of his position, Justice Levin observed that, in *People v. Keindl,* 68 N.Y.2d 410, 420–21, 509 N.Y.S.2d 790, 502 N.E.2d 577 (1986), "[t]he New York Court of Appeals rejected the continuing conduct exception [as applied] to sexual abuse, because those crimes as defined in the Penal Law of New York 'punish the performance of a single act.' " *Id.*[13]

In *Huddleston,* the Oklahoma Court of Criminal Appeals held "that when a child of tender years is under the exclusive domination of one parent for a definite and certain period of time and submits to sexual acts at that parent's demand, the separate acts of abuse become one transaction[.]" 695 P.2d at 10–11. The *Huddleston* court's view that the defendant's separate acts of sexual abuse "became one transaction" is puzzling, however, inasmuch as the defendant was charged with, and convicted of, three distinct counts of sexual assault—one count of first degree rape and two counts of oral sodomy—committed against his nine-year-old daughter. *Id.* at 9.

In *Clark,* a majority of the Montana Supreme Court had the following to say: ·

Both the original and the amended information set forth facts alleging a series of incidents of unlawful sexual contacts perpetrated by the step-father upon the child. Incestuous conduct is charged as a series of offenses of sexual intercourse without consent with the same minor victim.

Incest generally involves a continuing course of sexual conduct between two family members within the family home. Incestuous conduct usually consists of a series of unlawful sexual contacts between an adult family member and a child. In these respects, sexual offenses committed against a minor by a parent or step-parent are distinguishable from rape cases involving adult victims and a single criminal event in unfamiliar surroundings.

682 P.2d at 1344.

In our view, the foregoing language is both confusing and misleading. The defendant in *Clark* was charged with, and convicted of, *eight counts* of "sexual intercourse without consent" under Montana law. Insofar as the defendant was *convicted* of "a series of offenses" (plural), we fail to understand how, for *charging* purposes, he could be deemed to have engaged in a *single* "continuing course of sexual conduct." In any event, the *Clark* majority's discussion merely sought to explain why "[t]he defendant here had notice of the nature of the charges [plural] against him and [an] adequate opportunity to defend." *Id.* The propriety of amalgamating multiple offenses within a single count was obviously not at issue in the defendant's appeal. Had such an amalgamation been an option available to the prosecution, the *Clark* majority would, at the very least, have been confronted with the equal protection and due process issues addressed *infra* in section III. A.3. of this opinion.

Other jurisdictions have held that repeated acts of sexual assault on a child cannot, by their very nature, be treated as a single "continuing" offense. A salient example is *State v. Snook,* 210 Conn. 244, 555 A.2d 390 (1989), in which the defendant was charged, *inter alia,* with two counts of "risk of injury to a minor," in violation of a Connecticut criminal statute.[14] The first count alleged that between June 1979 and January 18, 1983, and between January 20, 1983 and January 11, 1984, the defendant committed acts likely to impair the health and morals of the victim (who was born on January 19, 1978). 555 A.2d at 392, 398. The second count alleged that, on January 19, 1983, the defendant also committed acts against the victim in violation of the statute. *Id.* at 398. The *Snook* court's description of the defen-

---

**13.** In light of our analysis *infra* in this opinion, we agree with Justice Levin.

**14.** The Connecticut statute provided in relevant part that "[a]ny person who wilfully or unlawfully ... does *any act* likely to impair the health or morals of any ... child [under the age of sixteen] shall be fined not more than five hundred dollars or imprisoned not more than ten years or both." *Snook,* 555 A.2d at 392 n. 2 (emphasis added).

dant's predicate conduct consisted of the following:

> In her videotaped testimony, the victim related two incidents in which the defendant engaged in various sexual activities with her while they had left the house to go for a walk and to fly a kite. The victim testified that on another occasion, the day of her birthday, while her mother was out shopping for a birthday present, the defendant brought her into a closet in their house, removed his pants and her pants, and rubbed her vagina. He then made her sit on his penis. This incident was interrupted when the defendant heard the mother's car door slam. The victim's mother testified that the last incident occurred on the victim's fifth birthday.

*Id.* at 393. A jury convicted the defendant of both charged offenses, after which he moved the trial court for a judgment of acquittal as to the second count, "claiming that a conviction on both counts ... violated his state and federal constitutional protections against double jeopardy." *Id.* at 398. The trial court denied the motion, and the defendant appealed.

Affirming the defendant's convictions, the *Snook* court ruled, *inter alia*, as follows:

> Double jeopardy prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense. Before the double jeopardy prohibition is triggered, however, it must appear that the crimes arose out of the same act or transaction. If a violation of law is not continuous in its nature, separate indictments may be maintained for each violation. Thus, *a distinct repetition of a prohibited act constitutes a second offense and subjects the offender to an additional penalty.*
>
> In the present case, the separate counts alleging risk of injury to a minor arose out of separate acts. The ... information makes clear that the defendant was charged with violating [the statute] as a result of at least two separate transactions: any acts occurring between June, 1979, through January 11, 1984, excepting January 19, 1983; and acts occurring on January 19, 1983. We disagree with the defendant that [the first count] alleged "a

violation of law continuous in nature," such that a separate count alleging a violation of [the statute] on a specific date was impermissible. The failure of the [prosecution] to obtain more specific information as to the date or dates of the acts alleged in [the first count] did not render the defendant's criminal conduct "a violation of law continuous in nature." *[The statute] as charged does not proscribe a continuing course of criminal conduct* but proscribes acts directly perpetrated on the person of the minor and injurious to his moral or physical well-being.... As we stated in an analogous context, "each separate act of forcible sexual intercourse constitutes a separate crime. A different view would allow a person who has committed one sexual assault upon a victim to commit with impunity many other such acts during the same encounter." If we adopted the defendant's reasoning, the commission of one act likely to impair the health and morals of a minor would insulate the perpetrator from further criminal liability for any additional acts of the same character perpetrated on the same minor in subsequent encounters. Such a result defies rationality.

> *A distinct repetition of an act prohibited by [the statute] constitutes a second offense.*

*Id.* at 398–99 (citations and some quotation marks omitted) (some ellipsis points omitted and some added) (emphases added).

*See also Covington,* 703 P.2d at 440 (holding that "[s]exual abuse of a minor is not a 'continuing offense' "); *State v. Petrich,* 101 Wash.2d 566, 683 P.2d 173, 177 (1984) ("The [prosecution's] attempt to ... characteriz[e] the charge as a continuing offense is not persuasive. Under appropriate facts, a continuing course of conduct may form the basis of one charge in an information. But *'one continuing offense' must be distinguished from 'several distinct acts,' each of which could be the basis for a criminal charge'.*" (Citations omitted.) (Emphasis added.)).

b. *Multiple sexual assaults, "continuing offenses," and the Hawai'i Penal Code*

As we have indicated, the prosecution in the present case invites us to apply the "con-

tinuing offense" construct to HRS §§ 707–730(1)(b) and 707–732(1)(b) so as to treat them as "two continuous offenses, sexual contact with a minor and sexual penetration of a minor." We cannot.

HRS § 701–102(1) (1993) provides that "[n]o behavior constitutes an offense unless it is a crime or violation under [the HPC] or another statute of this State." Accordingly, "[t]here are no common-law offenses in [Hawai'i]. . . . That all offenses should be adequately proscribed by statute seems at this point of legal development a dictate of fundamental fairness." Commentary on HRS § 701–102. *See also* HRS § 1–1 (1993) ("The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of [Hawai'i] in all cases, . . . provided that no person shall be subject to criminal proceedings except as provided by the written laws of the United States or of the State."); *State v. Ching*, 62 Haw. 656, 658, 619 P.2d 93, 94 (1980) ("In this jurisdiction, there are no common law offenses[.]" (Citation omitted.)). Correlatively, it is a purpose of the HPC "to define and codify certain specific offenses which constitute harms to basic social interests which the [HPC] seeks to protect." HRS § 701–103 (1993).

> The provisions of [the HPC] cannot be extended by analogy so as to create crimes not provided for [t]herein; however, in order to promote justice and effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of the words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision.

HRS § 701–104 (1993). *See Holbron*, 80 Hawai'i at 45, 904 P.2d at 930.

It is within the foregoing statutory context—as applied to the statutory elements and general principles described in section III.A.1. of this opinion, *supra*—that we must consider whether, as the prosecution urges in the present appeal, sexual assault in the first degree as defined by HRS § 707–730(1)(b), *see supra* note 2, and sexual assault in the third degree as defined by HRS § 707–732(1)(b), *see supra* note 1, respectively describe "continuous offenses" of "sexual penetration of a minor" and "sexual contact with a minor."

This court has defined a "continuing offense" as

> a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy[, or] an offense which continues day by day[, or] a breach of the criminal law, not terminated by a single act or fact, but subsisting for a definite period and intended to cover or apply to successive similar obligations or occurrences.

*State v. Temple*, 65 Haw. 261, 267 n. 6, 650 P.2d 1358, 1362 n. 6 (1982) (citation omitted). Put differently,

> [t]he test to determine whether [a] defendant intended to commit more than one offense in the course of a criminal episode is whether the evidence discloses one general intent or discloses separate and distinct intents. If there is but one intention, one general impulse, and one plan, there is but one offense.

*Ganal*, 81 Hawai'i at 379, 917 P.2d at 391 (quoting *State v. Castro*, 69 Haw. 633, 653, 756 P.2d 1033, 1047 (1988)) (quotation signals omitted).

The parameters of "continuing" offenses are circumscribed by HRS §§ 701–108(4) (1995), 701–109(1)(e) (1993), and 701–118(4) (1993), *see supra* at note 9. Examples of continuing offenses, within the meaning of the HPC, include: (1) first degree murder, in violation of HRS § 707–701(1)(a) (1993), whereby a person "intentionally or knowingly causes the death of . . . [m]ore than one person in the same or separate incident" (a substantive offense apparently unique to Hawai'i); *Ganal*, 81 Hawai'i at 378–79 & n. 25, 384, 917 P.2d at 390–91 & n. 25, 396; (2) first degree robbery, in violation of HRS § 708–840(1)(b) (1993); *Hoey*, 77 Hawai'i at 38 & n. 19, 881 P.2d at 525 & n. 19; (3) under certain circumstances, kidnapping, in violation of HRS § 707–720(1)(c) (1993); *id.* at 38 & n. 20, 881 P.2d at 525 & n. 20; (4) theft of a firearm, in violation of HRS §§ 708–830(7) (1993) and 708–830.5(1)(b) (1993); *Temple*, 65

Haw. at 266–68, 650 P.2d at 1361–62; and (5) theft of state property by deception, in violation of HRS § 708–830(2) (1993); *State v. Martin,* 62 Haw. 364, 367–69, 616 P.2d 193, 196–97 (1980). Each of these offenses is statutorily defined as an uninterrupted and continuing course of conduct, or manifests a plain legislative purpose to be treated as such, or both. *See* HRS §§ 701–108(4), 701–109(1)(e), and 701–118(4), *supra* at note 9.

The same cannot be said, however, with respect to the statutory scheme relating to "sexual offenses," HRS §§ 707–730 through 707–741 (1993), which the legislature substantially reorganized in 1986. *See* 1986 Haw.Sess.L.Act 314 [hereinafter, "Act 314"], §§ 48 and 57 at 615, 617–18. When interpreting this statutory scheme, we abide by several established rules of statutory construction. First, "our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute[s]" themselves. *Mathewson v. Aloha Airlines, Inc.,* 82 Hawai'i 57, 71, 919 P.2d 969, 983 (1996) (citation and quotation signals omitted); *State v. Kwak,* 80 Hawai'i 291, 295, 909 P.2d 1106, 1110 (1995) (citations and internal quotation marks omitted), *reconsideration granted,* 80 Hawai'i 297, 909 P.2d 1112 (1995); *Norton v. Administrative Director of Court, State of Hawai'i,* 80 Hawai'i 197, 201, 908 P.2d 545, 549 (1995) (citation omitted); *Cieri v. Leticia Query Realty, Inc.,* 80 Hawai'i 54, 67, 905 P.2d 29, 42 (1995) (citation omitted); *Toyomura,* 80 Hawai'i at 18, 904 P.2d at 903 (citation omitted); *Housing Fin. & Dev. Corp. v. Castle,* 79 Hawai'i 64, 77, 898 P.2d 576, 589 (1995) (citation and quotation marks omitted); *Aluli,* 78 Hawai'i at 320, 893 P.2d at 171 (citation omitted); *State v. Ortiz,* 74 Haw. 343, 351, 845 P.2d 547, 551, *reconsideration denied,* 74 Haw. 650, 849 P.2d 81 (1993) (citation omitted). Second, "[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another." HRS § 1–16 (1993);

*Richardson v. City and County of Honolulu,* 76 Hawai'i 46, 55, 868 P.2d 1193, 1202, *reconsideration denied,* 76 Hawai'i 247, 871 P.2d 795 (1994) (citation omitted). And, third, "[t]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction[,] and illogicality." *State v. Malufau,* 80 Hawai'i 126, 137, 906 P.2d 612, 623 (1995) (citation and internal quotation marks omitted).

The legislature has explained the purposes underlying its reorganization of the statutory scheme governing sexual offenses, effected by Act 314, as follows:

> The crimes of rape and sodomy have been eliminated[,] as well as the "voluntary social companion" distinction between first and second degree rape and sodomy offenses. All of the sexual offenses have been incorporated into five degrees of sexual assault.[15] The creation of the intermediate level of bodily injury allows for a graduated, five-level sexual assault scheme running from class A to a petty misdemeanor[,] which provides punishment [that] reflects the seriousness of the offense committed . . . .

Hse.Conf.Comm.Rep. No. 51–86, in 1986 House Journal, at 938; Sen.Conf.Comm.Rep. No. 51–86, in 1986 Senate Journal, at 748. In order to underscore its intent that each distinct sexual offense be subject to separate punishment, the legislature added a definition of "sexual penetration" to HRS § 707–700, *see supra* note 2, which provides, *inter alia,* that "[f]or purposes of this chapter, each act of sexual penetration shall constitute a separate offense." Act 314, § 48 at 615. The new definition clarified that, "even though rape and sodomy [were] renamed sexual assault offenses, the prosecutors [could] still multiple charge a defendant for each act of penetration." Hse. Conf.Comm.Rep. No. 51–86, in 1986 House Journal, at 938; Sen.Conf.Comm.Rep. No. 51–86, in 1986 Senate Journal, at 748.[16]

---

15. In 1991, the legislature redesignated the title of HRS § 707–734 from "Sexual assault in the fifth degree" to "Indecent exposure." 1991 Haw.Sess.L.Act 214, § 2 at 499.

16. Considering the differences between common law rape and sodomy, as codified in the pre-Act 314 HPC, the prosecution's startling suggestion, set forth in its answering brief, that "the provi-

Given the clear language of, and interrelationship among, the provisions of the statutory scheme governing sexual offenses, there is little wonder that the appellate courts of this state have consistently recognized that each act constituting a sexual assault is punishable as a separate and distinct offense. *State v. Horswill*, 75 Haw. 152, 857 P.2d 579 (1993) is a recent example. Horswill was convicted of multiple offenses, including two counts of sexual assault in the first degree and two counts of sexual assault in the third degree. The evidence at trial established that, within a brief and uninterrupted period of time,

Horswill ... placed his mouth on Complainant's breast [and] made her (1) place his penis in her mouth; (2) place her hands on his penis; and (3) place his penis in her vagina. Shortly thereafter, Horswill fell asleep. When Complainant attempted to leave, Horswill awoke, choked her, and placed her back in bed. They had intercourse a second time, after which Horswill again fell asleep.

75 Haw. at 155, 857 P.2d at 581. Affirming Horswill's convictions on appeal, this court ruled, *inter alia*, that "it is possible for a defendant in the context of one criminal transaction to commit several acts independently violative of one or more statutes, and he or she may be punished for all of them if charges are properly consolidated by the prosecution in one trial." *Id.* at 162, 857 P.2d at 584 (citations omitted).

In *State v. Rulona*, 71 Haw. 127, 785 P.2d 615 (1990), the defendant was convicted of two counts of sexual assault in the first degree, in violation of HRS § 707–730(1)(b), and two counts of sexual assault in the third degree, in violation of HRS § 707–732(1)(b), all of the offenses being committed against the same minor. He appealed one of his first degree sexual assault convictions on the ground that there was "no allegation, nor any proof of penetration of the alleged victim's

vagina by his tongue." 71 Haw. at 128, 785 P.2d at 616. In support of his point of error, the defendant pointed "to the fact that first degree sexual assault, against a person under 14 years of age, requires sexual penetration, while third degree sexual assault, of such a person, merely requires sexual contact." *Id.* This court rejected the defendant's argument:[17]

Sexual penetration is defined, among other things, in HRS § 707–700 as including cunnilingus. Cunnilingus is not defined in the penal code. The word is derived from the Latin word "cunnus" meaning the vulva and the Latin verb "linctus[,]" the act of licking, and thus is defined as the stimulation of the vulva, or clitoris, with the lips or tongue. *See Webster's New International Dictionary* (3d ed. 1976).

It may seem anomalous that touching the vulva with the penis, without physical penetration, would apparently constitute sexual contact and, hence, in the case of a child under 14, would constitute third degree sexual assault, while touching the same spot with the tongue, without physical penetration, would nevertheless constitute sexual penetration for the purposes of the [HPC], and thus be sexual assault in the first degree. Nevertheless, it is the legislature's prerogative to act anomalously, if it wishes. The language of the statute is clear and [the defendant's] point ... is not well taken.

*Id.* at 128–29, 785 P.2d at 616.

Inasmuch as the plain language of HRS § 707–700 interposes "any penetration, however slight" as a precondition to "sexual penetration" in any of its forms, *see supra* note 2, the *Rulona* court's analytical judgment that "sexual penetration" of the complainant had been proved as to the count at issue before it appears questionable to us. What is *not* questionable, however, is the fact that the defendant was properly charged with

---

sion of sexual penetration as a separate offense was only meant to allow the State to bring multiple charges on the same act of penetration" not only reflects some basic anatomical confusion, but—at the very least—also flies in the face of HRS § 701–109. *See State v. Molitoni*, 6 Haw. App. 77, 79–80, 711 P.2d 1303, 1306, *cert. denied*, 68 Haw. 692 (1985).

17. The *Rulona* court reversed the defendant's convictions on other grounds and remanded the matter to the circuit court. 71 Haw. at 133, 785 P.2d at 618.

four separate and distinctly punishable offenses against the minor victim and that his allegedly unlawful conduct did not constitute a single continuing offense.

In *State v. Hoopii*, 68 Haw. 246, 710 P.2d 1193 (1985), a pre-Act 314 case, the defendant engaged in the following conduct, which the prosecution in the present matter would presumably characterize, *inter alia*, as the "continuous offense" of "sexual penetration of a minor":

> [The defendant] abducted the [six-year-old] girl as she walked home from school. He first drove her to a beach area off Lagoon Drive, then to another unknown location, and then back to the original beach area. At some point, he tied the girl's wrists and ankles with rope and covered her mouth and eyes with tape. He later untied her, removed her clothing and *raped* and *sodomized* her.

68 Haw. at 247, 710 P.2d at 1194 (emphases added). Affirming the circuit court's denial of the defendant's motion to dismiss the multiple counts pursuant to HRS § 701–109(1)(e), *see supra* note 9, the *Hoopii* court reasoned as follows:

> HRS § 701–109(1)(e) prohibits multiple convictions where the defendant's actions constitute an uninterrupted, continuing course of conduct. This prohibition, however, does not apply *where these actions constitute separate offenses under the law.* Furthermore,
>
> > where a defendant in the context of one criminal scheme or transaction commits several acts independently violative of one or more statutes, he may be punished for all of them if charges are properly consolidated by the [prosecution] in one trial.

State v. Pilago, 65 Haw. 22, 24, 649 P.2d 363, 365 (1982); *State v. Pia*, 55 Haw. 14, 19, 514 P.2d 580, 585 (1973).

In this case, [the defendant] committed and completed the act of kidnapping at the moment he restrained the victim by abducting her, putting her in his van and driving away. Any restraint which continued throughout the subsequent rape and sodomy was not necessary to the perpetration of the kidnapping. *State v. Decenso*, 5 Haw.App. 127, 135, 681 P.2d 573, 580 (1984). [The defendant] would still be subject to prosecution for kidnapping had he not continued to restrain the victim throughout *the rape and sodomy.* Moreover, these later acts *themselves constituted separate and independent offenses.*

*Id.* at 251–52, 710 P.2d at 1197 (footnote omitted) (emphases added).

*See also State v. Molitoni*, 6 Haw.App. 77, 79–80, 711 P.2d 1303, 1305–06 (holding, pursuant to HRS § 701–109, "that three separate criminal acts [against the complainant] occurred" where, in sequence and rapid order, the defendant "1) squeezed and sucked [the complainant's] breasts; 2) touched her vagina with his hand and 'put his fingers in [her]'; and 3) inserted his penis into her vagina" (some brackets in original and some added)), *cert. denied*, 68 Haw. 692 (1985).

#### c. *The bottom line*

■ Consistent with the foregoing, and based upon the plain language of the statutes, construed in pari materia within the framework of the entire statutory scheme governing sexual offenses, we hold [18] that sexual assault in the first degree, in violation of HRS § 707–730(1)(b), and sexual assault in the third degree, in violation of HRS § 707–732(1)(b), are not—and cannot be—"continuing offenses" and that each distinct act in violation of these statutes constitutes a separate offense under the HPC.[19] Were

---

**18.** The dissent agrees with our holding. *See* dissenting opinion at 38, 928 P.2d at 880. Thus, the dissent's observation that "several jurisdictions have concluded that, under certain circumstances, sexual assault of a minor is a continuing offense," *id.* at 38, 928 P.2d at 880, and its sympathetic discussion of *Huddleston, Clark, Cooks*, and *State v. Spigarolo*, 210 Conn. 359, 556 A.2d 112 (1989) in connection therewith, *id.* at 39–40, 928 P.2d at 881–882, are both beside the

point. *See* section III.A.2.a. of this opinion, *supra.*

**19.** We do not intend that our holding impose a blanket *obligation* on the part of the prosecution, in a given case, to charge every provable act that may constitute a sexual assault. *See State v. Petrich*, 101 Wash.2d 566, 683 P.2d 173, 178 (1984), *infra* at section III.C.2. of this opinion. "Within constitutional limits, it is always the

this not the case, "a person who has committed one sexual assault upon a victim [could] commit with impunity many other such acts during the same encounter," and "the commission of one act ... would insulate the perpetrator from further criminal liability for any additional acts of the same character perpetrated on the same minor in subsequent encounters." *Snook*, 555 A.2d at 399. We agree with the Connecticut Supreme Court that "[s]uch a result defies rationality," *id.*, and, as such, is an absurdity that we presume that the legislature did not intend. *See Malufau*, 80 Hawai'i at 137, 906 P.2d at 623.

3. *Construing sexual assaults simultaneously as continuing and distinct offenses would violate the "Modica rule."*

■ We recognize that an argument could be made that although, consistent with the analysis set forth in section III.A.2. of this opinion, *supra*, the offenses described in HRS §§ 707–730(1)(b) and 707–732(1)(b) punish separate and distinct acts of sexual penetration and sexual contact committed against minors under fourteen years of age, they may nevertheless be treated as continuing offenses at the prosecution's option. The simple response to such an argument would be that the construction of sexual assaults as simultaneously constituting continuing and distinct offenses would violate the rule established in *State v. Modica*, 58 Haw. 249, 567 P.2d 420 (1977), and expressly reaffirmed in *State v. Kuuku*, 61 Haw. 79, 595 P.2d 291 (1979).

> This court has ruled that
> [a] denial of [the] rights [to due process and the equal protection of the laws] would ... result ... if a violation of [a] misdemeanor statute ... would invariably and necessarily constitute a violation of [a] felony provision.... Thus, where the same act committed under the same circumstances is punishable either as a felony or as a misdemeanor, under either of two statutory provisions, and the elements of proof essential to either

conviction are exactly the same, a conviction under the felony statute would constitute a violation of the defendant's rights to due process and the equal protection of the laws.

> [*Modica* ], 58 Haw. [at] 250–51, 567 P.2d [at] 421–22 ... (citation omitted). The "*Modica* rule," which applies equally to the possibility of prosecution and conviction under two differentially classed felonies (for example, under either a class [A] felony statute or a class C felony statute), was expressly reaffirmed in ... *Kuuku*, 61 Haw. [at] 80–81 [ & n. 1], 595 P.2d [at] 293 [ & n. 1]....

*Aluli*, 78 Hawai'i at 324, 893 P.2d at 175 (Levinson, J., concurring) (some brackets and ellipsis points in original and some added).

Construing HRS § 707–730(1)(b) and HRS § 707–732(1)(b) as simultaneously constituting continuing and distinct offenses would inevitably generate the very evils rendered unlawful by the *Modica* rule. First, a single violation of the "continuing" felony offense via the commission of multiple acts of sexual assault would invariably and necessarily constitute multiple and distinct violations of precisely the same felony statute. Second, and correlatively, the same acts committed under the same circumstances could, by virtue of the prosecution's charging option or whim, be punishable either as a single offense or as multiple offenses, even though the elements of proof essential to either result would be exactly the same. *See* section III.A.1. of this opinion, *supra*.

Thus, to permit multiple convictions of the sexual assault statutes, when treated as describing "distinct" offenses, where only a single conviction could be obtained as a result of a violation of the same statutes, when treated as describing "continuing" offenses, would precipitate exactly the due process and equal protection violations that the *Modica* rule was designed to prevent. *Cf. Gaylord*, 78 Hawai'i at 138, 890 P.2d at 1178 (quoting

prosecution's prerogative to undercharge any offense for whatever reason it deems appropriate, be it 'mitigating circumstances' (in the 'non-term of art' sense) or otherwise." *Holbron*, 80 Ha-

wai'i at 44, 904 P.2d at 929 (emphasis deleted). The *Holbron* proposition applies equally to multiple offenses.

*State v. Lee,* 75 Haw. 80, 92–93, 856 P.2d 1246, 1254 (1993), for the propositions that (1) "[d]ue process of law requires that a penal statute state with reasonable clarity the act it proscribes and provide fixed standards for adjudicating guilt, or the statute is void for vagueness," and (2) "a criminal statute is void for vagueness unless[ ] it ... provide[s] explicit standards for those who apply the statute, in order to avoid arbitrary and discriminatory enforcement and the delega[tion] of basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis") (citations and internal quotation marks omitted) (some brackets in original and some added).

B. *Subject To An Election Of The Specific Acts Upon Which The Prosecution Was Seeking To Convict Arceo Of The Charged Offenses, Or, In The Alternative, "Specific Unanimity" Instructions To The Jury, The Minor's Testimony Regarding Multiple Sexual Assaults Constituted Direct Evidence Of The Charged Offenses And, As Such, Did Not Relate To "Other" Crimes, Wrongs, Or Acts With Which HRE 404(b) Is Concerned.*

██ In support of his claim that the circuit court "erred in refusing to exclude evidence of other crimes and bad acts [that] were not probative of a fact in consequence and [that] were highly prejudicial and misleading to the jury," Arceo advances the following argument:

[H]ere, the evidence of [multiple] acts of sexual penetration and sexual contact with the [Minor] served to show [Arceo's] propensity to commit the crime and were not facts of consequence under [HRE] Rule 404(b).[20] Clearly, the danger of unfair prejudice outweighed any possible probative value under [HRE] Rule 403.[21] Could not a juror have simply concluded: "[I]f the boy said he did all these things, he must have done some of them." This evidence was highly prejudicial and mis-

leading to the jury. Its admission by the trial court was [an] abuse of discretion.

Given the Minor's testimony that, during the time period charged in the indictment, Arceo subjected him to five separate and distinct acts of sexual penetration [22]—twice by inserting his finger into the Minor's anus (on each occasion, in the shower located in the shelter), once by inserting his penis into the Minor's anus (while the Minor was sleeping on the bed provided by the shelter), and twice by performing fellatio upon the Minor (also while the Minor was in the bed)—and two separate and distinct acts of sexual contact [23]—once by placing his penis on the Minor's penis (while the Minor was in the bed) and once by placing his penis on the Minor's back (also while the Minor was in the bed)—, combined with the circuit court's reversible error in failing either to require the prosecution to make an election as to the specific acts upon which it was relying in seeking to convict Arceo of the two charged offenses, or, in the alternative, to give the jury a "specific unanimity" instruction with respect to each charged offense, *see* section III.C.2. of this opinion, *infra,* there is some cogency to Arceo's argument. In the absence of such reversible error, there is not.

██ As a thorough review of A. Bowman, *Hawaii Rules of Evidence Manual* §§ 404–1 through 404–3B (1990 & Supp.1995) [hereinafter, *"Bowman on Evidence"*] suggests, HRE 404 is a complex rule about which there is much confusion. For present purposes, there is utility in going back to basics with respect to the *raison d'etre* of HRE 404(b). As Professor Bowman explains,

[t]he first sentence of [HRE] 404(b) reiterates the general exclusion of character evidence and precludes evidence of *other* crimes or *similar* bad acts when offered *circumstantially* to show propensity by means of the two-link inferential chain from *previous* behavior to character to action "in conformity therewith." ... There is no discretion and there are no exceptions. The second sentence confirms an

20. *See supra* note 5.

21. *See supra* note 4.

22. *See supra* note 2.

23. *See supra* note 1.

obvious truth: The evidence may be admissible to prove "any other fact that is of consequence to the determination of the action." But as the commentary [to HRE 404] points out, the use of the word "may" serves as a reminder that this species of evidence inherently raises the question of [HRE] 403 even when purposes other than propensity are presented.

*Bowman on Evidence*, § 404–2B at 106–07 (citation omitted) (emphases added). In other words, within the context of criminal cases [24] and as applied to defendants therein, HRE 404(b) constitutes a limitation either on the use of evidence of "previous" crimes or on the use of bad acts "other" than, or "similar" to, the conduct that is an element of the offense or offenses with which the defendant is presently charged. The rule has no application to the use of evidence that is *directly* probative of an element of the charged offense or offenses.

*Alston, supra*, provides an apt illustration of the foregoing proposition. In that case, the defendant was convicted, *inter alia*, of terroristic threatening in the first degree, *i.e.*, threatening, by word or conduct and on more than one occasion, to cause bodily injury to the victim with the intent to terrorize, or in reckless disregard of the risk of terrorizing, the victim. *Alston*, 75 Haw. at 520, 525, 865 P.2d at 161, 163. The defendant urged on appeal that the trial court had erroneously disregarded HRE 403 and 404(b) by admitting into evidence certain statements that he had made to persons other than the victim, on the ground that the "sole and only purpose of the [prosecution's] seeking to admit the evidence was to show [the defendant's] propensity for committing bad and violent acts, matters which are clearly prejudicially inadmissible." *Id.* at 537, 865 P.2d at 168 (some brackets added and some deleted). Citing *State v. Chung*, 75 Haw. 398, 412–13, 862 P.2d 1063, 1071 (1993), for

the principle that "the offense of terroristic threatening does not require that the person to whom the threats are directed actually be terrorized by the threats," this court rejected the defendant's argument and affirmed his conviction, ruling that

the challenged statements were relevant as direct evidence of a material element of terroristic threatening. . . . *[A]s direct evidence of the charged offense, a fortiori, the challenged statements did not constitute "other" crimes, wrongs, or acts with which HRE 404(b) is concerned.* For these reasons, we hold that the trial court did not abuse its discretion in admitting the challenged statements.

*Id.* at 542, 865 P.2d at 169–70 (citation omitted) (emphasis added).

As we noted in section I. of this opinion, the prosecution stipulated that the indictment returned against Arceo in this case covered "all alleged sexual assaults of the [M]inor by [Arceo] during the specified period while they were living on Maui." As such, the two separate and distinct acts of sexual contact to which the Minor testified at trial were directly subsumed within Count One of the indictment, and the five separate and distinct acts of sexual penetration to which he testified at trial were directly subsumed within Count Two. The prosecution explained its aggregation of multiple acts of sexual assault within each count of the indictment— which, as we have held *supra* in section III.A.2.c. of this opinion, the prosecution mischaracterized as "continuing offenses"—on the basis that "[m]inors can rarely be expected to recall the specific date, time, and details of repeated sexual offense[s]." [25]

There is general agreement in the case law of other jurisdictions with the prosecution's view of the foreseeable character of the testimony of child victims of repeated sexual assaults.[26] For example, in *People v. Aldrich*,

24. "The bar of [HRE] 404(a) and 404(b) is comprehensive, and therefore applicable to civil cases" as well. *Bowman on Evidence*, § 404–2C at 117.

25. We note that, in the present case, the Minor purported to recall seven separate, distinct, and specific sexual assaults, perpetrated by Arceo, that occurred either in the shower or the bed-

room of the shelter during the period of time when he and Arceo sojourned there.

26. The relevant social science literature relating to the cognitive capacities of children is extensively compiled and summarized in L. McGough, *Child Witnesses* (1994), published by the Yale University Press. In the introduction, Professor McGough explains, *inter alia*, that

[t]his book is written for a general audience of readers who are curious about the believability of child witnesses, especially their credibility as trial witnesses. The research this book reports is transdisciplinary—it includes both "social science" chapters and "legal" chapters, and I have tried to demystify some of the more forbidding jargon of each discipline.... Finally, this book is written for professionals and concerned citizens who are committed to improving the law's rules and processes as they affect children who are drawn into legal controversies.

For the past two centuries in the Anglo–American legal system, children have been permitted to give testimony in trials. For at least the past ninety years, since juvenile courts were created in this country, thousands of children have taken the witness stand each working day, across the country, in every community.... In abuse and neglect cases, children are asked to tell the intimate details of their families' daily lives, even to give evidence in support of the state's claims that they have been harmed by their parents' conduct....

... The child witness becomes the indispensable witness usually only when he or she is the victim, especially in crimes with slight or no corroborating evidence, such as sexual molestation. These cases brought the legal treatment of child witnesses to the forefront of public debate in the 1980s.

*Child Witnesses* at 1–2. Among the more pertinent scientific questions, findings, and conclusions reported by Professor McGough are the following: (1) "[a]ge appears to be the dominant variable among all the diverse characteristics of a child witness"; *id* at 24; (2) "[c]hildren do not differ from adults in physical capacity for observation.... From birth, a normally endowed human possesses the full complement of sensory organs"; *id.* at 24–25; (3) "actions are typically more memorable to a young child than speech"; *id.* at 25; (4) "children are attentive observers of their world and ... they 'encode,' or make an initial mental record of, some details of a witnessed action ... that observing adults would miss"; *id.;* (5) "[t]he key to whether a child will attend to a particular detail and thus be able later to recall its presence is the importance of the ... action to the child"; *id.;* (6) "[t]here is now universal agreement that at least for such single stimulus tasks as basic item identification, children of three are very reliable and those older than four and a half have 'excellent, almost adult-level recognition memory performance'"; *id.* at 26; (7) "even four-year-olds can accurately recall the basic temporal order of events"; *id.* at 28; (8) "[c]hildren are also no more prone than adults to confuse actual frequency of events with imagined presentations"; *id.* at 29; (9) "mastery of the concepts of time and distance increases with age[;] ... five-year-olds were unable to make either required analysis[;] ... the time concept was rarely attained by either eight- or eleven-year-olds, and only adults used it extensively in problem solving"; *id.* at 31; (10) "[a]lthough general alarms are often raised that children have 'weak memories' and are 'less accurate than adults in their perceptions' ..., in fact very young children, even three-year-olds, can relate accurately ... relatively simple information"; *id.* at 32; (11) "[a] child possesses the sensory capability and attentiveness needed to tell what happened. A young witness may even have noticed more details than an adult bystander"; *id.;* (12) "[a]s long as a child is asked to use recognition or recall memory soon after the event to be remembered, reliability risks are minimal and no greater than for adult testimony"; *id.;* (13) "however, the dangers of memory error due to imaginative reconstruction or traumatic reaction pose more serious challenges"; *id.;* (14) "[t]he question ... is whether the indisputable trauma of being emotionally and sexually abused diminishes or distorts the ordinary cognitive abilities of a child witness. Again, the more precise question is whether such victimization is more likely to distort the perceptions of a child than those of an adult"; *id.* at 45; (15) "reported studies [that] have ... focused on extremely traumatic experiences, such as ... the child's having been subjected to physical ... or sexual abuse ... [,] report an increased misperception by victimized children of both the duration and the sequencing of events and an elaboration of certain perceptual details"; *id.* at 48; (16) "[t]he scientific jury is still out on the issues of the potential effects of confabulation and trauma on the reliability of children's memory. Yet neither risk seems to justify the creation of new legal rules"; *id.* at 50; (17) "memory-fade and suggestibility are inextricably interrelated. Lengthy delays in retrieving a child's statements can stretch his or her recall memory and resistance to suggestibility past the breaking point"; *id.* at 53; (18) "[s]cientific data demonstrate that all other reliability risks pale compared to the potential, perhaps inevitable, distortions of memory-fade and suggestibility"; *id.;* (19) "verbatim memory traces fade more quickly over time than do memories for the gist of an experience"; *id.* at 54; (20) "some features of an experience may be more salient, more memorable, for a young child than an older person, or even uniquely significant to a child"; *id.;* (21) "children are less able to access distant experiences than adults"; *id.;* (22) "Although acquisition, retention, and retrieval failures can inhibit and distort, a significant body of research indicates that at each stage, children's memory is weaker and more fragile than that of adults"; *id.* at 55; (23) "We must ask: *What* kind of memory is required of the child? *When* is the child's memory tested? *Who* is the child's questioner, and *where* does the interview take place? *How* is the child's memory elicited? A final question, which some empiricists suspect is the most important, is *why* is the retrieval of the child's memory important? What is the context of memory retrieval, and more precisely, what motivations arise out of that context that might prompt the child to re-

849 P.2d 821 (Colo.Ct.App.1992), the court made the following observations:

> In cases involving a continuing pattern of sexual abuse of very young children, in which the evidence consists primarily of the children's statements, it is not likely that they will clearly identify the specific instances when particular acts took place. The difficulty of presenting testimony limited to a specific incident in such cases was discussed in *State v. Brown*, 55 Wash.App. 738, 780 P.2d 880 (1989):
>
>> Particularly when the accused resides with the victim or has virtually unchecked access to the child, and the abuse has occurred on a regular basis and in a consistent manner over a prolonged period of time, the child may have no meaningful reference point of time or detail by which to distinguish one specific act from another. The more frequent and repetitive the abuse, the more likely it becomes that the victim will be unable to recall specific dates and places. Moreover[,] because the molestation usually occurs outside the presence of witnesses, and often leaves no permanent physical evidence, the [prosecution's] case rests on the testimony of a victim whose memory may be clouded by a blur of abuse and a desire to forget.[27]

*Id.* at 825–26 (citation omitted). *Cf. Jones*, 270 Cal.Rptr at 623, 792 P.2d at 655 ("Recent studies have undermined traditional notions regarding the unreliability of child witnesses, their untruthfulness, susceptibility to leading questions, or inability to recall prior events accurately. 'Empirical studies have produced results indicating that most of these traditional assumptions are completely unfounded.' (Fote, *Child Witnesses in Sexual Abuse Criminal Proceedings: Their Capabilities, Special Problems, and Proposals for Reform* (1986) 13 Pepperdine L.Rev. 157, 158.)") (additional citations omitted).

In *Covington, supra*, the Alaska Court of Appeals addressed the applicability of that state's Evidence Rules 403 and 404(b), which are identical to HRE 403 and 404(b), to the testimony of child victims of sexual abuse as follows: [28]

> [The defendant] filed a motion for a protective order [presumably the equivalent of a motion in limine] prohibiting the [prosecution] from introducing evidence of alleged sexual relations between [the defendant] and [the Minor] occurring prior to . . . and after [the period covered by the indictment]. The trial court denied [the defendant's] motion in reliance on *Burke v. State*, 624 P.2d 1240 (Alaska 1980). In *Burke*, the supreme court considered this issue in the context of Evidence Rule[s] 404(b) and . . . 403. The court noted that where the specific crime charged was sexual abuse of a minor, the common law position supported by an overwhelming majority of states is that evidence of prior similar conduct with the same victim is admissible. 624 P.2d at 1247. The court affirmed admissibility of the evidence stressing that all of the acts involved the same victim. The court accepted two closely related rationales: first, the evidence tended to establish the ongoing relationship between the accused and the victim and explained, in part, the victim's inability to specifically describe separate incidents; and, secondly, it served to explain the victim's testimony in its context, particularly indicating why she might acquiesce in the defendant's demands. 624 P.2d at 1249–50. We believe both of those rationales are applicable here

---

member accurately or inaccurately?" *Id.* (emphases in original); (24) "the encoding of memory traces is affected by salience and . . . what is well encoded is more resistant to change"; *id.* at 68; and (25) "[a]ll . . . data confirm a developmental trend that shows increasing suggestibility as age decreases. Six-year-olds are more suggestible than either nine- and fourteen-year-olds or adults"; *id.*

27. As indicated in section I. of this opinion, *supra*, the Minor testified that he underwent counseling for the express purpose of enabling him "to forget about it." Even to laypersons,

such counseling would seem to be of obvious therapeutic benefit.

28. Because we hold *infra* in this section that, in the absence of the kind of trial error that occurred in this case, HRE 404(b) is not applicable to the circumstances of the present appeal, the *Covington* court's Rule 404(b) analysis is inapposite, inasmuch as it dealt with testimony regarding sexual assaults occurring *prior and subsequent* to the period covered by the indictment at issue. The *Covington* court's views are, however, germane to the application of HRE 403 to the present case.

and justify the admission of the evidence. *Given our holding today that the prosecution must either elect to prove a particular incident or that the jury must be instructed that it must unanimously agree on a particular incident,*[29] we believe the evidence is highly material to explain the witness' difficulties in specifying incidents so that her testimony may be considered in the context in which it arose.

*Covington,* 703 P.2d at 441 (footnotes omitted) (emphasis added).

 Combining the analyses set forth in *Aldrich* and *Covington, supra,* we hold as a threshold matter that, by virtue of the vulnerabilities to which child victims of repeated instances of sexual abuse are susceptible, the prosecution may, at its option, seek a single conviction by charging multiple acts, each of which constitutes a separate and distinct sexual assault, within a single count of an indictment or complaint.[30] We therefore hold that, if the prosecution does so, then testimony regarding any or all of the multiple acts is "direct evidence of the charged offense" and does not implicate "'other' crimes, wrongs, or acts with which HRE 404(b) is concerned."[31] *See Alston,* 75 Haw. at 542, 865 P.2d at 170; *see also Bowman on Evidence,* § 404–2B at 106–07.[32] Thus, for the reasons stated in *Covington,* 703 P.2d at 441, we hold that the probative value of the testimony would outweigh the danger of unfair prejudice to the defendant and would survive a challenge under HRE 403.

**29.** *See* section III.C. of this opinion, *infra.*

**30.** Obviously, the prosecution remains free to charge multiple counts of separate and distinct acts of sexual assault. *See* section III.A.2. of this opinion, *supra.* But, barring some other constitutional infirmity, the prosecution' decision to allege multiple sexual assaults in a single count, subject to the obligation either to elect the particular act on which it is relying at the close of its case-in-chief or to acquiesce in the giving of a "specific unanimity" instruction to the jury, *see* section III.C.2. of this opinion, *infra,* does not raise the "*Modica* problem" discussed *supra* in section III.A.3 of this opinion.

**31.** Our holding in this regard directly addresses—and reflects our agreement with—the dissent's belief that "a child's inability to specifically remember every detail and date of an alleged

**C.** *In Light Of The Constitutional Right To A Unanimous Verdict In A Criminal Case, When Evidence Of Multiple Culpable Acts Is Adduced In Support Of A Single Count Charging A Defendant With A Sexual Assault, Considerations Of Due Process Mandate That The Trial Court Either Require The Prosecution, At The Close Of Its Case–In–Chief, To Elect The Specific Act On Which It Is Relying To Establish The "Conduct" Element Of The Charged Offense, Or, In The Alternative, Give The Jury A "Specific Unanimity" Instruction.*

 As his final point of error on appeal, Arceo contends that, by virtue of his constitutional right to be free from a criminal conviction other than by a unanimous verdict in a jury trial, and "given the number of different acts alleged, [he] could not get a fair trial unless [either] the [prosecution] was required to identify the specific act of sexual contact and the specific act of sexual penetration for which it was seeking the two convictions [or] ... the [trial] court [was required to] ... instruct[] the jury that [it] must unanimously agree on the same act[s] in reaching ... guilty verdict[s]." We agree.

1. *Article I, sections 5 and 14 of the Hawai'i Constitution mandate that a criminal conviction in a jury trial must be by unanimous verdict.*

It is well established in this jurisdiction that a "fair trial ... is guaranteed to the

[sexual] assault[] should not form a basis on which to insulate a defendant from conviction." Dissenting opinion at 39, 928 P.2d at 881. We disagree, however, with the dissent's suggestion that "the testimony of the [M]inor in this case ... makes clear the difficulty in charging a defendant with separate offenses based on the testimony of a child when the sexual conduct is continuous and over a period of time." *Id.* at 39, 928 P.2d at 881. As noted in section I. of this opinion, the prosecution, in its memorandum in opposition to Arceo's motion on limine, expressed its clear willingness to amend the indictment to charge Arceo with the eight or nine separate and distinct sexual assaults to which the Minor had testified.

**32.** Of course, if the prosecution does not do so, then HRE 404(b) and its attendant considerations would be called into play. *See Bowman on Evidence,* § 404–2B at 106–07.

criminally accused by both the sixth amendment to the United States Constitution and article I, [section] 14 of the Hawai'i Constitution, as well as by principles of due process under both the state and federal constitutions." *Furutani*, 76 Hawai'i at 179, 873 P.2d at 58 (citations and quotation signals omitted) (some brackets added and some omitted). A criminal defendant's right to due process under state law is codified in article I, section 5 of the Hawai'i Constitution. *See supra* note 3.

In this connection, although it is not expressly stated therein, the right of an accused to a unanimous verdict in federal criminal prosecutions is subsumed within the sixth amendment to the United States Constitution.[33] *Andres v. United States*, 333 U.S. 740, 748, 68 S.Ct. 880, 884, 92 L.Ed. 1055 (1948). However, a bare majority of the United States Supreme Court has held that the fourteenth amendment does not *mandate* unanimous verdicts for convictions in criminal prosecutions in *state* courts. *Johnson v. Louisiana*, 406 U.S. 356, 359, 363, 92 S.Ct. 1620, 1623, 1625, 32 L.Ed.2d 152 (1972); *see also Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972).[34] Nevertheless, we have long recognized, "beginning with *State v. Texeira*, 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967), that 'as the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution, we are free to give broader protection under the Hawai'i Constitution than that given by the federal constitution.'" *Wallace*, 80 Hawai'i at 397 n. 14, 910 P.2d at 710 n. 14 (quoting *Hoey*, 77 Hawai'i at 36, 881 P.2d at 523). *A fortiori*, it follows that we are free to give the *same* protection under our state constitution as that given by the federal constitution, even if we are not bound by the fourteenth amendment to do so.[35]

**33.** The sixth amendment to the United States Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[ ] by an impartial jury[.]"

**34.** Four members of the Court responded to the *Johnson* and *Apodaca* holdings with alarm. Justice Douglas, dissenting in both cases and joined by Justices Brennan and Marshall, characterized the majority's rejection of the defendants' claims (*i.e.*, that their state court convictions by sub-unanimous juries violated their federal constitutional rights) as a "radical departure from American traditions." 406 U.S. at 381, 92 S.Ct. at 1643, 32 L.Ed.2d 170 "The unanimous jury has been so embedded in our legal history," Justice Douglas wrote, "that no one would question its constitutional position and thus there was never any need to codify it. Indeed, no criminal case dealing with a unanimous jury has ever been decided by this Court before today, largely because of this unquestioned constitutional assumption." *Id.* at 382 n. 1, 92 S.Ct. at 1644 n. 1. Citing *Andres*, 333 U.S. at 748, 68 S.Ct. at 884, Justice Stewart (joined in dissent in *Apodaca* by Justices Brennan and Marshall) declared that, "[u]ntil today, it has been universally understood that a unanimous verdict is an essential element of a[s]ixth [a]mendment jury trial." 406 U.S. at 414, 92 S.Ct. at 1634-35. Speaking for the same triumvirate in *Johnson*, Justice Stewart protested that "the [f]ourteenth [a]mendment alone clearly requires that if a [s]tate purports to accord the right of trial by jury in a criminal case, then only a unanimous jury can return a constitutionally valid verdict." 406 U.S. at 397, 92 S.Ct. at 1626. Dissenting in both cases and joined by Justice Marshall, Justice Brennan ruminated that

[r]eaders of today's opinions may be understandably puzzled why convictions by 11–1 and 10–2 jury votes are affirmed ..., when a majority of the Court agrees that the [s]ixth [a]mendment requires a unanimous verdict in federal criminal jury trials, and a majority also agrees that the right to jury trial guaranteed by the [s]ixth [a]mendment is to be enforced against the [s]tates according to the same standards that protect that right against federal encroachment.

406 U.S. at 395, 92 S.Ct. at 1650. Unable to "refrain from adding [his] protest to that of [his] Brothers DOUGLAS, BRENNAN, and STEWART," Justice Marshall, joined by Justice Brennan, remonstrated in *Johnson* and *Apodaca* that

[t]oday the Court cuts the heart out of two of the most important and inseparable safeguards the Bill of Rights offers a criminal defendant: the right to submit his case to a jury, and the right to proof beyond a reasonable doubt. Together, these safeguards occupy a fundamental place in our constitutional scheme, protecting the individual defendant from the awesome power of the State. After today, the skeleton of these safeguards remains, but the Court strips them of life and of meaning.

406 U.S. at 399–400, 92 S.Ct. at 1651–1652.

**35.** Other state courts already have. For example, citing the due process clause of its state's constitution, the California Supreme Court has "acknowledge[d] that the requirement of unanimity in criminal cases is of constitutional origin." *Jones*, 270 Cal.Rptr. at 626, 792 P.2d at 658. The Michigan Supreme Court construes its state constitution to "maintain[ ] the unanimity requirement, albeit in criminal prosecutions

The Organic Act, 31 Stat. 141, ch. 339, promulgated by the United States Congress on April 30, 1900 "to provide a government for the Territory of Hawaii," dictated in relevant part that "[n]o person shall be convicted in any criminal case except by unanimous verdict of the jury." *Id.* at § 83. . The controlling law of Hawai'i has remained consistent in this regard ever since.

The Admissions Act of March 18, 1959, Pub.L. 86–3, 73 Stat. 4, by which Congress effected the admission of the State of Hawai'i into the United States, provided in relevant part that admission "shall effect no change in the ... criminal law governing such ... criminal offenses which shall have arisen or been committed." *Id.* at § 12. Article I, section 14 of the Hawai'i Constitution (1978), which is the state's analogue to the sixth amendment to the United States Constitution, provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury...." By contrast, article I, section 13, which is the state's analogue to the seventh amendment to the United States Constitution,[36] preserves the right to a jury trial in civil cases, subject to the caveat that "[t]he legislature may provide for a verdict by not less than three-fourths of the members of the jury."

The statutory codifications of the foregoing constitutional principles are located in HRS ch. 635 (1993). With respect to *both* criminal *and* civil trials, HRS § 635–13 (1993) provides that "[w]hen the right of trial by jury is given by the Constitution or a statute of the United States or this State and the right has not been waived, the case shall be tried with a jury." HRS § 635–20 (1993) provides that "[i]n all *civil* cases tried before a jury it shall be sufficient for the return of a verdict if at least five-sixths of the jurors agree on the verdict." (Emphasis added.)

Article VI, section 7 of the Hawai'i Constitution (1978) provides that this court "shall have power to promulgate rules and regulations in all civil and criminal cases for all courts relating to process, practice, procedure and appeals, which shall have the force and effect of law." HRS § 602–11 (1993) contains the identical language, except that it deletes any reference to "regulations." Having "the force and effect of law," this court's rules of court are analogous to statutes. *State v. Merino,* 81 Hawai'i 198, 217 n. 20, 915 P.2d 672, 691 n. 20 (1996). Pursuant to this constitutionally and statutorily conferred authority, this court has promulgated HRPP 31(a), ·which provides in relevant part that verdicts in *criminal* cases "shall be unanimous, unless otherwise stipulated to by the parties." By contrast, Hawai'i Rules of Civil Procedure Rule 48 provides in relevant part that the parties to a *civil* action "may stipulate ... that a verdict ... of a stated majority of the jurors shall be taken as the verdict ... of the jury."

In *State v. Shak,* 51 Haw. 612, 466 P.2d 422 (1970), this court recognized that

> [t]he Hawaiian counterpart of the 6th amendment to the United States Constitution is Art. I, Sec. 11 [now article I, section 14] of our State Constitution. It is modeled on the 6th amendment, and we have said that in interpreting it we will look to the federal case law on the subject as a guide, pursuant to the expressed intent of the draftsmen of our constitution.

*Shak,* 51 Haw. at 615, 466 P.2d at 424 (citing *State v. Wong,* 47 Haw. 361, 385, 389 P.2d 439, 452 (1964)).

■■ With *Shak* in mind, we apply HRS § 1–16 (1993) (mandating that laws in pari materia be construed with reference to each other), and the principles of *noscitur a soci-*

---

only," notwithstanding that the unanimity requirement is not expressly stated therein. *Cooks,* 521 N.W.2d at 278 & n. 11. The Washington Supreme Court has held that, in that state, "a defendant may be convicted only when a unanimous jury concludes that the criminal act charged in the [indictment or] information has been committed." *Petrich,* 683 P.2d at 176 (citing *State v. Stephens,* 93 Wash.2d 186, 607 P.2d 304 (1980)). The Alaska Court of Appeals apparently takes for granted "the premise that the accused has a right to a unanimous verdict." *Covington,* 703 P.2d at 440.

**36.** The seventh amendment to the United States Constitution provides in relevant part that "[i]n suits at common law, ... the right of trial by jury shall be preserved[.]"

is[37] and *expressio unius est exclusio alterius*[38] to the foregoing federal and state constitutional provisions, congressional acts, state statutes, and court rules. Inasmuch as (1) the inviolable right to a unanimous jury verdict in *criminal* (as opposed to civil) cases is an essential element of the sixth amendment to the United States Constitution, *see Andres*, 333 U.S. at 748, 68 S.Ct. at 884, (2) that right has been an integral and consistent component of Hawai'i law at least since the promulgation by Congress of the Organic Act in 1900, and (3) the global right to a fair trial—within which the right to a unanimous verdict in criminal jury trials would be subsumed—is guaranteed, *inter alia,* by article I, section 14 and the concept of due process enshrined in article I, section 5 of the Hawai'i Constitution, *see Furutani*, 76 Hawai'i at 179, 873 P.2d at 58, we look to *Andres* as a guide in interpreting article I, sections 5 and 14 with respect to those rights, pursuant to the expressed intent of the framers of the Hawai'i Constitution. Because *Andres* and its progeny, *see Johnson* and *Apodaca*, hold that the right to a unanimous jury verdict in criminal cases is guaranteed by the sixth amendment to the United States Constitution, we in turn hold that the right of an accused to a unanimous verdict in a criminal prosecution, tried before a jury in a court of this state, is guaranteed by article I, sections 5 and 14 of the Hawai'i Constitution. *See State v. Iosefa*, 77 Hawai'i 177, 185, 880 P.2d 1224, 1232 (App.) (implicitly recognizing that defendant "was entitled to a unanimous verdict" as to the charged offense), *cert. dismissed*, 77 Hawai'i 373, 884 P.2d 1149 (1994).

## 2. *Election of specific act on which the prosecution intends to rely and "specific unanimity" instruction*

As an adjunct of its holding that unanimity in jury verdicts is required where the sixth amendment applies, and in light of the fact that a general "verdict embodies in a single

finding the conclusions by the jury upon all questions submitted to it," the United States Supreme Court has held that, "[i]n criminal cases[,] this requirement of unanimity extends to all issues . . . which are left to the jury." *Andres*, 333 U.S. at 748, 68 S.Ct. at 884. We have held that the same requirement inheres in article I, sections 5 and 14 of the Hawai'i Constitution. *See* section III. C.1. of this opinion, *supra*. Therefore, inasmuch as, pursuant to this "precept of constitutional . . . law, . . . an accused in a criminal case can only be convicted upon proof by the prosecution of every material element of the crime charged beyond a reasonable doubt," *Wallace*, 80 Hawai'i at 406, 910 P.2d at 719 (quoting *State v. Puaoi*, 78 Hawai'i 185, 191, 891 P.2d 272, 278 (1995)) (emphasis and brackets deleted), the constitutional "precept" also implicates the defendant's right to due process of law, *see Iosefa*, 77 Hawai'i at 182, 880 P.2d at 1229; *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970), and the elements of sexual assault in the first and third degree include, respectively, *particular* acts of sexual penetration and sexual contact, *see* section III.A.2. and 3. of this opinion, *supra*, we now squarely address Arceo's contention—given the Minor's testimony that Arceo committed multiple acts of sexual penetration and sexual contact within the context of single counts charging each—that *either* the prosecution was required to elect the specific acts upon which it was relying in seeking convictions of the charged offenses or the circuit court was required to give the jury a "specific unanimity" instruction as to each count. Arceo's point of error raises a question of first impression in this jurisdiction.

The jurisdictions requiring unanimity of jury verdicts in criminal cases and holding that sexual assaults are not "continuing offenses" appear to be in agreement that, where evidence of multiple culpable acts is adduced to prove a single charged offense,

---

**37.** " '[T]he canon of construction denominated *noscitur a sociis* . . . may be freely translated as 'words of a feather flock together,' that is, the meaning of a word is to be judged by the company it keeps.' " *Merino*, 81 Hawai'i at 217, 915 P.2d at 691 (quoting *Aluli*, 78 Hawai'i at 321, 893 P.2d at 172) (ellipsis points in original).

**38.** The maxim *expressio unius est exclusio alterius* means "the mention of one thing implies the exclusion of another." *International Sav. and Loan Ass'n v. Wiig*, 82 Hawai'i 197, 200, 921 P.2d 117, 120 (1996) (quoting *Black's Law Dictionary* 763 (6th ed. 1990)).

the defendant is entitled either to an election by the prosecution of the single act upon which it is relying for a conviction or to a specific unanimity instruction. For example, in *Petrich*, the defendant

> was charged with one count of indecent liberties and one count of second degree statutory rape. At trial, numerous incidents of sexual contact were described in varying detail. He was convicted on both counts and [sought] review of his convictions, contending that the [prosecution's] failure to elect the act upon which it relied for each conviction deprived him of his right to a unanimous jury verdict.
>
> . . . .
>
> At the end of the [prosecution's] case, the defense moved to compel the [prosecution] to elect which offense was to be relied on for conviction, arguing that [the] defendant was charged with only one count of each offense but [that] the evidence showed several incidents. Defense counsel pointed out that unless the jury agreed on one particular incident as the basis for each charge, the verdict would not be unanimous. The [prosecution] responded that one continuing offense had been charged. The motion to compel election was denied.

683 P.2d at 176. Holding that "the trial court's failure to ensure a unanimous verdict warrant[ed] a new trial," *id.*, the *Petrich* court engaged in the following analysis, which we deem to be highly persuasive:

> [The defendant] concedes that an instruction was not requested which could have informed the jury that it must unanimously agree on the same criminal act for conviction on each charge. . . . Under the circumstances, [the defendant's] failure to request an instruction did not waive his objection. [The defendant] made a proper motion before the trial court, fully apprising the court of his argument and its legal basis. The denial of that motion was reasonably interpreted as the trial court's final decision on the matter. Renewal of [the defendant's] argument, in the form of a jury instruction based on the same claim, was not required to preserve this issue.

When the evidence indicates that several distinct criminal acts have been committed, but [the] defendant is charged with only one count of criminal conduct, jury unanimity must be protected. . . . The [prosecution] may, in its discretion, elect the act upon which it will rely for conviction. Alternatively, if the jury is instructed that all 12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt, a unanimous verdict on one criminal act will be assured. When the [prosecution] chooses not to elect, this jury instruction must be given to ensure the jury's understanding of the unanimity requirement.

These options are allowed because, in the majority of cases in which this issue will arise, the charge will involve crimes against children. Multiple instances of criminal conduct with the same victim is a frequent, if not the usual, pattern. Note, *The Crime of Incest Against the Minor Child and the States' Statutory Responses*, 17 J.Fam.Law 93, 99 (1978–79). Whether the incidents are to be charged separately or brought as one charge is a decision within prosecutorial discretion. Many factors are weighed in making that decision, including the victim's ability to testify to specific times and places. Our decision in this case is not intended to hamper that discretion or encourage the bringing of multiple charges when, in the prosecutor's judgment, they are not warranted. The criteria used to determine that only a single charge should be brought[ ] may indicate that the election of one particular act for conviction is impractical. In such circumstances, [the] defendant's right to a unanimous verdict will be protected with proper jury instructions.

In [the defendant's] case, the evidence indicated multiple instances of conduct which could have been the basis for each charge. The victim described some incidents with detail and specificity. Others were simply acknowledged, with attendant confusion as to date and place, and uncertainty regarding the type of sexual contact that took place. The [prosecution] was not required [by the trial court] to elect, nor was jury unanimity ensured with a clarify-

ing instruction.... [The defendant] is entitled to a new trial.

*Id.* at 178.

*See also Covington,* 703 P.2d at 440–41 (relying on *Petrich* analysis and holding, where (1) defendant was charged with multiple counts of sexual assault, (2) evidence of several distinct criminal acts could support each count, and (3) prosecution "did not elect specific incidents, nor was a clarifying instruction given," that reversible error was committed, thus entitling defendant to new trial); *Aldrich,* 849 P.2d at 825 (relying on *Thomas v. People,* 803 P.2d 144 (Colo.1990), and *Woertman v. People,* 804 P.2d 188 (Colo. 1991), and holding that defendant's right to unanimous jury agreement was ensured because, (1) "although the trial court denied the defendant's pre-trial motion to compel an election, at the close of the trial, the trial court did compel the prosecutor to elect the specific incidents of conduct upon which it relied," (2) "the jury ultimately was instructed as to the specific incidents upon which the charges were based," and (3) the jury "was also given a unanimity instruction" (emphasis omitted)); *State v. Brown,* 762 S.W.2d 135, 137 (Tenn.1988) (holding that prosecution was required to elect specific offense upon which guilty verdict was demanded, where evidence showed two separate instances of sexual battery on six-year-old girl).

Although not arising in the context of sexual assaults committed against young children, a line of federal decisions supports a requirement that the jury be given a specific unanimity instruction under the circumstances of this case. *See United States v. Echeverry,* 719 F.2d 974, 975 (9th Cir.1983) ("When it appears ... that a conviction may occur as a result of different jurors concluding that the defendant committed different acts, the general unanimity instruction does not suffice. To correct any potential confusion in such a case, the trial judge must augment the general instruction to ensure [that] the jury understands its duty to unanimously agree to a particular set of facts."); *United States v. Payseno,* 782 F.2d 832, 836–37 (9th Cir.1986) (ruling that there was "the genuine possibility that some jurors may have believed [that the defendant] used ex-

tortionate means on one occasion while others may have believed that he was guilty of engaging in extortion at a different time and place," and that "*Echeverry* clearly sets forth the rule that we are not free to speculate about what the jurors agreed to in their ... deliberation over [the defendant's] guilt or innocence," and, accordingly, holding that "a general unanimity instruction will not suffice when the possibility of such jury confusion exists" and that the trial court committed plain error in failing to give a specific unanimity instruction); *United States v. Gilley,* 836 F.2d 1206, 1211–13 (9th Cir.1988) (reaffirming *Echeverry* and *Payseno* and holding that (1) there was "a genuine possibility that the jurors were not unanimous as to the conjunction of two of the material elements of the crime," (2) "[t]his [was] not a case where the case was sufficiently simple and clear in its presentation that unanimity [could] be assumed based on the general [unanimity] instruction," (3) "[r]ather, it [was] a case involving a sufficiently complex set of facts requiring the judge sua sponte to give a specific unanimity instruction," (4) "[b]ecause the deficiency in the trial judge's instructions prejudiced the defendant's substantial rights to a unanimous jury verdict ..., ... plain error occurred," and (5) "a conviction for conducting an illegal gambling business ... cannot stand where the guilty verdict cannot with reasonable certainty be said to stem from a unanimous verdict" (citations and quotation marks omitted)); *United States v. Anguiano,* 873 F.2d 1314, 1318–20 (9th Cir.) (reaffirming *Echeverry, Payseno,* and *Gilley*), *cert. denied,* 493 U.S. 969, 110 S.Ct. 416, 107 L.Ed.2d 381 (1989); *United States v. Jerome,* 942 F.2d 1328, 1331 (9th Cir.1991) (reaffirming *Echeverry* and *Gilley*).

 In our view, the logic of *Petrich, Covington, Aldrich, Brown,* and the line of federal decisions arising out of *Echeverry* is cogent, compelling, and ineluctable. Accordingly, we hold that when separate and distinct culpable acts are subsumed within a single count charging a sexual assault—any one of which could support a conviction thereunder—and the defendant is ultimately convicted by a jury of the charged offense, the defendant's constitutional right to a

unanimous verdict is violated unless one or both of the following occurs: (1) at or before the close of its case-in-chief, the prosecution is required to elect the specific act upon which it is relying to establish the "conduct" element of the charged offense; or (2) the trial court gives the jury a specific unanimity instruction, *i.e.*, an instruction that advises the jury that all twelve of its members must agree that the same underlying criminal act has been proved beyond a reasonable doubt.[39]

Although, as noted in section I. of this opinion, *supra*, Arceo argued, in support of his motion in limine, that the prosecution should be required to elect the particular acts on which it was relying in seeking convictions of the charged offenses, he neither objected to the circuit court's general unanimity instructions to the jury nor requested a specific unanimity instruction and therefore alleges plain error on appeal regarding the defective jury instructions. "We may recognize plain error when the error committed affects substantial rights of the defendant." *Horswill*, 75 Haw. at 155, 857 P.2d at 581–82 (citing *Kelekolio*, 74 Haw. at 515, 849 P.2d at 75); *see also Kinnane*, 79 Hawai'i at 50, 897 P.2d at 977 ("[I]t may be plain error for a trial court to fail to give an ... instruction even when neither the prosecution nor the defendant have requested it ... because ... the ultimate responsibility properly to instruct the jury lies with the circuit court and

not with trial counsel.") (Citation, internal quotation signals, and footnote omitted.) (Emphasis deleted.); HRPP 52(b) (1995) ("Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

■ We need not decide whether, pursuant to the reasoning of *Petrich*, by expressly seeking an order requiring the prosecution to elect the culpable acts on which it relied for convictions, Arceo impliedly preserved the point of error regarding the circuit court's failure to give a specific unanimity instruction because, insofar as the circuit court erroneously failed to observe either of the options mandated in the preceding paragraph, Arceo's substantial constitutional right to unanimous jury verdicts was prejudiced in such a manner as to give rise to plain error. And inasmuch as we cannot say that there was no reasonable possibility that the circuit court's error contributed to Arceo's convictions, we hold that the error was not harmless beyond a reasonable doubt. *See Holbron*, 80 Hawai'i at 32, 904 P.2d at 917.

## IV. CONCLUSION

For the foregoing reasons, we vacate Arceo's judgment of conviction and remand the matter for a new trial[40] consistent with this opinion.

NAKAYAMA, J., dissents.

39. The dissent is "in agreement ... that an accused is guaranteed the right to a unanimous verdict in a criminal prosecution under article I, sections 5 and 14 of the Hawai'i Constitution and that the issue of jury unanimity is the kind of substantial right properly viewed under ... plain error analysis." Dissenting opinion at 37, 928 P.2d at 879. The dissent also concedes "that the [circuit] court's failure to require the prosecution to elect a specific act upon which it would rely in seeking convictions of the charged offenses [and] its failure to give a specific unanimity instruction on each count" constituted "error." *Id.* at 34, 928 P.2d at 876. However, inasmuch as the dissent does not view "this error [as] obviously prejudicial to [Arceo]," it "would not ... recognize" the error "as plain error." *Id.* at 37, 928 P.2d at 879. It is apparent that the dissent can only reach this conclusion by importing into its analysis a construct of harmless error to which we do not adhere. *See supra* note 8.

We should mention that we express no opinion, as a policy matter, regarding the dissent's

exhortation that "the legislature ... enact a continuing sexual abuse of a child statute," dissenting opinion at 41, 928 P.2d at 883, akin to California Penal Code § 288.5, *id.* at 41 & n. 6, 928 P.2d at 883 & n. 6. We presume, however, that the dissent does not wish to "allow a person who has committed one sexual assault upon a victim to commit with impunity many other such acts during the same encounter" or to "insulate the perpetrator from further criminal liability for any additional acts of the same character perpetrated on the same minor in subsequent encounters." *See Snook*, 555 A.2d at 399. We also presume that the dissent does not envision a statute that would create the "*Modica* problem." *See* section III.A.3. of this opinion, *supra*.

40. Because our disposition of the present appeal is grounded in "trial error" and the evidence adduced at trial was clearly sufficient to support Arceo's convictions, double jeopardy concerns are not implicated by a new trial. *See Wallace*, 80 Hawai'i at 413–14, 910 P.2d at 726–27.

NAKAYAMA, Justice, dissenting.

I disagree with the majority's holding in Part III(C)(2) that the trial court's failure to require the prosecution to elect a specific act upon which it would rely in seeking convictions of the charged offenses, or its failure to give a specific unanimity instruction on each count, constituted plain error. Because the defendant neither objected to the general unanimity instruction given to the jury, nor requested a specific unanimity instruction, and because the error did not effect the fundamentally fair trial received by defendant, I do not believe it rises to the level of plain error.

Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) provides that "[p]lain errors or defects affecting substantial rights *may* be noticed although they were not brought to the attention of the court." (emphasis added). The word "may" is dispositive because it indicates the court's notice of plain error is discretionary, not mandatory. This rule has been interpreted by this court as follows:

> This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes. Nevertheless, where plain error has been committed and substantial rights have been affected thereby, the error may be noticed even though it was not brought to the attention of the trial court.

*State v. Kelekolio*, 74 Haw. 479, 515, 849 P.2d 58, 75 (1993) (citing *State v. Fox*, 70 Haw. 46, 55–56, 760 P.2d 670, 675–76 (1988) (other citations omitted)). "Plain error is a *highly prejudicial error* affecting substantial rights, and is found only in exceptional circumstances." *United States v. Ancheta*, 38 F.3d 1114, 1116 (9th Cir.1994) (emphasis added) (citing *United States v. Kessi*, 868 F.2d 1097, 1102–03 (9th Cir.1989)). "[T]he decision to take notice of plain error must turn on the facts of the particular case to correct errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings.'" *Fox*, 70 Haw. at 56, 760 P.2d at 676 (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

The question of whether a trial court's failure to compel the prosecution to elect a specific act upon which it would rely in order to establish the conduct of the charged offense, or the trial court's failure to give the jury a specific unanimity instruction, rises to the level of plain error when a defendant (1) fails to object to the jury instruction given, or (2) fails to request the specific unanimity instruction, has been addressed by the Alaska Court of Appeals in *State v. Covington*, 711 P.2d 1183 (Alaska.Ct.App.1985), *appeal after remand*, 747 P.2d 550 (Alaska.Ct.App.1987) and the Michigan Supreme Court in *People v. Van Dorsten*, 441 Mich. 540, 494 N.W.2d 737 (1993). Both courts concluded that these errors did not rise to the level of plain error.

On a petition for rehearing, the court in *Covington*, 711 P.2d 1183 (*Covington II*), reversed its previous opinion in *Covington v. State*, 703 P.2d 436 (Alaska.Ct.App.1985) (*Covington I*). In *Covington I*, the court reversed and remanded the case on the basis that the prosecution failed to elect specific incidents upon which it intended to rely for conviction, and the trial court failed to instruct the jury on a specific unanimity instruction. *Id.* at 441. The majority relied on and quoted extensively from *Covington I*, but failed to acknowledge the subsequent rehearing of the case.

On rehearing, decided six months later, the prosecution challenged the court's holding in *Covington I*, "that [defendant] was denied his constitutional right to a unanimous verdict." *Covington II*, 711 P.2d at 1184. *Covington II* reversed this holding and affirmed the judgment of the trial court, holding that these errors were not plain error. As in the present case, in *Covington II*, the prosecution argued that the defendant failed to (1) raise in the trial court this issue concerning his constitutional right to a unanimous jury verdict, (2) object to the jury instructions given, or (3) indicate at any stage of the proceedings that he was concerned about a unanimous verdict. *Id.* at 1184. Defendant argued on rehearing that he raised these issues in arguments concerning deficiencies

in the indictment and the denial of his bill of particulars, and alternatively, that this issue "affected his constitutional right to an unanimous jury verdict" and therefore, qualified as plain error. *Id.*

The court initially determined that defendant failed to sufficiently raise this issue in the trial court and therefore, considered the errors under the plain error doctrine.

In citing Alaska Rule of Criminal Procedure 47(b), which is identical to HRRP Rule 52(b), the *Covington II* court applied the following standard to determine if the errors rose to the level of plain error. "Under the 'plain error' embodied in Alaska Rule of Criminal Procedure 47(b), [the supreme court] will not take notice of an error not brought to the attention of the trial court unless it affects a substantive right *and is obviously prejudicial.*" *Id.* at 1184 (citations omitted) (emphasis added). The court observed:

> We are satisfied that the issue of jury unanimity is the kind of substantial right properly reviewed under the plain error doctrine. We are also satisfied that, under the circumstances outlined in our earlier opinion, the error in this case was sufficiently obvious to satisfy the plain error test. We are, therefore, left with the requirement that the error substantially prejudiced a defendant before he can rely on it for reversal. We considered this aspect of the plain error test in *Van Hatten [v. State,* 666 P.2d 1047, 1056 (Alaska.Ct.App.1983).]
>
> [T]he plain error rule has been held to embody the requirement that the error complained of is obviously prejudicial. [Citation omitted.] There has been little effort to define the obvious prejudice requirement of the plain error rule. We think it clear, however, that the term obvious prejudice demands the application of a standard more stringent than the harmless beyond a reasonable doubt test applied to determine harmless error in cases where errors of constitutional dimension are preserved for appeal by timely objection.

*Covington II,* 711 P.2d at 1184–85 (citation omitted, some brackets added, others in original). The court reasoned that the correct standard to apply under a plain error analysis is that an "error is harmless where it can be fairly said that the alleged error did not appreciably affect the jury's verdict." *Id.* at 1185 (citation omitted).

The court next examined whether the error in failing to require the prosecution to elect a specific incident within each count and the failure of the court to give a specific unanimity instruction appreciably affected the jury's verdict.

The complaining witness, the daughter of the defendant, testified that defendant began sexually abusing her when she was nine or ten years old, by sleeping with her, touching her breasts, and digitally penetrating her vagina. *See, Covington I,* 703 P.2d at 438. At age 13, after her mother died, she began sleeping in the same bed with her father. *Id.* At age 16, she testified she had sexual intercourse with her father "practically every night" up until age 19, when she moved out of the house. *Id.* The court noted that the complaining witness "was not able to differentiate between various incidents" of abuse. *Covington II,* 711 P.2d at 1185. "She testified that she shared a bed with her father during the totality of the time in question and that they engaged in sexual intercourse almost every night." *Id.* The defendant acknowledged sharing the bed with his daughter, but denied ever having intercourse with her. Based on this divergence in testimony, the court observed:

> Under the circumstances, no impeaching or contrary evidence was more applicable to one incident than another. Thus, each juror was faced with a straight question of credibility. Did he or she believe the victim, in total, or, based on [defendant's] testimony and the impeachment and contradiction of the victim, did he or she have a reasonable doubt as to the accuracy of the victim's testimony? The jury's verdict on all counts established that it accepted the victim's testimony and concluded that [the defendant] was guilty, beyond reasonable doubt, of the offenses in question. Necessarily, the jury rejected [the defendant's] testimony and the impeaching and

contradictory evidence upon which he relied.

It concluded:

Under the circumstances, the record unequivocally establishes that the trial court's error in not requiring the state to elect among incidents, or alternatively, in failing to provide a curative instruction, did not appreciably affect any verdict against [the defendant]. Consequently, we reconsider our decision to reverse on this ground and conclude that the trial court's error was not plain error under Alaska Rule of Criminal Procedure 47(b).

*Covington II*, 711 P.2d at 1185.

In *Van Dorsten*, 441 Mich. 540, 494 N.W.2d 737, a case not involving a minor, the defendant was charged and convicted of a single count of first-degree criminal sexual conduct based on five separate acts of sexual penetration. The trial court gave the jury a general unanimity instruction. However, the defendant did not object to this instruction, or make a request for a further instruction concerning unanimity with respect to a particular penetration. The Michigan Court of Appeals reversed defendant's conviction, holding that the failure to give a specific unanimity instruction constituted plain error resulting in "manifest injustice" to the defendant.[1] *Id.*, 494 N.W.2d at 738.

In reversing the judgment of the Court of Appeals, the Michigan Supreme Court held that any error by the trial court was harmless because the defendant never objected to the court's instruction, did not request his own instruction and most importantly, because the verdict did not result in manifest injustice.

Similar to the *Covington II* analysis, the Supreme Court of Michigan noted that "[t]he number or specific identification of acts of sexual penetration was not in dispute," because "[t]he defendant's position was simply that there was no sexual assault committed." *Van Dorsten*, 494 N.W.2d at 739. It stated:

It was obvious to the participants in the trial that the verdict turned on whether the jury believed the testimony of the complainant and Terry Doyle on the one hand, or found reasonable doubt that any sexual assault occurred, as claimed by the defendant. Given that posture of the case, there was no reason for the parties to focus on the specifics of individual penetrations. In this context, the failure to give an instruction requiring unanimity on a particular act in no way impeded the defense or denied the defendant a fair trial.

*Id.* at 739.

Other courts have held, albeit not in the context of a plain error analysis, that a specific unanimity instruction was not warranted where the defendant denied engaging in any incidents of sexual abuse or contact, because the issue presented to the jury hinged on the credibility of the defendant and the complaining witness. In *People v. Cooks*, 446 Mich. 503, 521 N.W.2d 275 (1994), the court held that the defendant

did not present a separate defense to offer materially distinct evidence of impeachment regarding any particular act. He merely denied the existence of any inappropriate behavior. Thus, the sole task for the jury was to determine the credibility of the victim with respect to the pattern of the alleged conduct. Because neither party presented materially distinct proofs regarding any of the alleged acts, the factual basis for the specific unanimity instruction . . . was nonexistent.

*Id.*, 521 N.W.2d at 286. *See also People v. Higgins*, 9 Cal.App.4th 294, 307, 11 Cal. Rptr.2d 694, 698 (1992) ("[W]hen the issue presented to the jury is whether a defendant committed a course of conduct and not whether he committed a specific act on a specific day, the prosecutor does not have to elect a specific act and the jury need not unanimously agree on a specific act.") (citation omitted). In *People v. Deletto*, 147 Cal. App.3d 458, 466–67, 195 Cal.Rptr. 233, 237–38 (1983), *cert. denied*, 466 U.S. 952, 104 S.Ct. 2156, 80 L.Ed.2d 542 (1984), the minor victim alleged that the defendant sexually assaulted her on at least two occasions. The

---

1. Although the *Van Dorsten* court did not specifically delineate plain error in its opinion, a fair reading of the term "manifest injustice," as used by the court, shows that the court intended this meaning.

defendant asserted that the court erred in not giving a specific unanimity instruction to the jury. The court rejected this argument, stating:

> [t]his is not a case in which different witnesses testified as to one incident but not the other or where different items in real evidence were introduced to prove one act but not the other, so that they jury might have distinguished between the credibility of different witnesses or the weight to be given various items of real evidence.

*Id.* at 466–67, 195 Cal.Rptr. at 237–38 (citations omitted).

These cases, particularly *Covington II* and *Van Dorsten,* establish that where a defendant *denies all instances* of sexual abuse or contact, the concerns regarding whether the jury was unanimous in its verdict are nonexistent, because the jury was left to either accept or reject the complainant's testimony. Thus, the issue is one of credibility. Any errors that may have resulted in failing to elect or failing to instruct the jury were deemed harmless because they had no effect on the ultimate verdict of the jury.

I am in agreement with the majority that an accused is guaranteed the right to an unanimous verdict in a criminal prosecution under article I, section 5 and 14 of the Hawai'i Constitution and that the issue of jury unanimity is the kind of substantial right

properly viewed under the plain error analysis. *See Covington II,* 711 P.2d at 1184. However, based on *Covington II* and *Van Dorsten,* and utilizing a more sensible plain error analysis to include (1) whether substantial rights of the defendant were affected, and (2) whether this error was obviously prejuc al to the defendant, I am not convinced that the defendant was prejudiced by (a) the court's failure to require the prosecution to elect the specific act upon which it was relying to establish the conduct element of the charged offense; or (b) the trial court's failure to give the jury a specific unanimity instruction. I would not, therefore, recognize these errors as plain error.

Applying this standard to the present case necessitates the same conclusions found in *Covington II* and *Van Dorsten.* The minor testified that defendant subjected him to five acts of sexual penetration, and at least two acts of sexual contact during the time charged in the indictment.[2] On crossexamination, the minor admitted that he told Detective Rojas of the Maui Police department that his father had touched him approximately twelve times, but could only guess at the specific number of instances, because he had a difficult time remembering what had occurred three years ago. Nevertheless, the defendant denied all acts of sexual penetration, or sexual contact as testified to by his son.[3] By reason of this sharply contrast-

---

**2.** Contrary to the majority opinion, the minor testified that his father engaged in sexual contact with him on, *at least,* two occasions. The first contact involved the father placing his penis on the minor's back, the second contact involved the placing of the father's penis on his penis, at least one time. The minor testified:

> Q; Okay. Now, do you remember other times, other places where your Dad touched you at the shelter?
> A: The bedroom.
> Q: Is that the same bedroom that's shown here where it says, bed?
> A: Yes.
> Q: Where in the bedroom did that happen?
> A: In the bed.
> Q: In the bed and would that be in the day or the night.
> A: Evening and the night.
> Q: Did it happen once or more than once?
> A: I think once.
> Q: One time?
> A: Maybe.
> Q: Okay. What do you mean maybe.

> A: *Maybe it's more or maybe it's once.*
> Q: Were you counting the time that things happened?
> A: *I don't remember.*

**3.** The defendant testified that he touched his son in the shower only in the course of teaching him how to clean himself. On cross examination, he testified:

> Q: Would you ever touch him when the two of you were taking showers together:
> A: Yes.
> Q: Would you explain how you touched him and what you were doing?
> A: Well, um, first of all, he was a very young boy. He doesn't know how to take shower yet by himself and I had to scrub medicated shampoo in his hair to take off the bugs and fleas. And I was teaching him how to do this personal hygiene. And I wash him, his entire body down, cleaning him....

According to this testimony and the fair import giving thereto, the father's actions in teaching his

ing testimony, the jury was faced with an issue of credibility, of believing the minor, or, based on defendant's testimony and the impeachment of the minor, whether there existed reasonable doubt as to the accuracy of the minor's testimony. The jury's verdict of guilty on all counts established that it accepted the minor's testimony and rejected the defendant's as well as the impeaching evidence upon which he relied. It likewise concluded that the defendant was guilty beyond a reasonable doubt of the offenses in question. Had the defendant admitted to one or two incidents of sexual penetration or contact with his son, then there would be a reasonable possibility that individual jurors could have rejected some of these incidents, but accepted the other incidents as proven. That being the case, the jurors could have agreed that the defendant committed one or two of the incidents, but be in general disagreement as to which specific incident. This scenario could then only be remedied by a specific unanimity instruction.

However, that was not the substance of defendant's testimony. The defendant denied *in toto* all incidents of sexual penetration or sexual contact with the minor. Because this was an issue of credibility, and credibility alone, I would hold that defendant was not obviously prejudiced because these errors did not contribute to defendant's conviction on all counts. Accordingly, these errors were harmless and did not rise to the level of plain error.

Because this court has repeatedly cautioned that the plain error rule should be exercised sparingly and utilized with great discretion and caution, *see Kelekolio, supra,* we should not therefore, be so quick to reward a defendant for inviting error by reason of his or her own malfeasance. The stringent standard traditionally accorded to the plain error rule has eroded in recent years and I urge that it be restored to the status and role for which it was designed.

Further, I agree with the majority's holding in Part III(A)(2)(c) that under the current Hawai'i Penal Code (HPC), sexual as-

sault in the first degree pursuant to Hawai'i Revised Statutes (HRS) § 707–730(1)(b) (1993), and sexual assault in the third degree pursuant to HRS § 707–732(1)(b) (1993) are not "continuing offenses" because they represent distinct acts and therefore, separate offenses. However, I urge the Hawai'i legislature to enact a "continuous sexual abuse of a child" statute under the HPC, similar to the statute enacted by the State of California, to cure the problems inherent in the criminal prosecution of sexual abuse cases involving a minor of tender years who is unable to specifically recall dates, instances or circumstances surrounding the abuse.

In cases involving the sexual assault of a child, the prosecution's key witness is usually a child with a limited ability to recall alleged acts with specificity. This is particularly problematical and evident in cases involving sexual assault of a child by a parent, where the child may be of tender years, under the exclusive control of the parent or guardian, and when the abuse has occurred on a number of occasions over a period of time. The problems manifested by these cases has been articulated as follows:

> In cases involving a continuing pattern of sexual abuse of very young children, in which the evidence consists primarily of the children's statements, it is not likely that they will clearly identify the specific instances when particular acts took place. The difficulty of presenting testimony limited to a specific incident in such cases was discussed in *State v. Brown,* 55 Wash.App. 738, 780 P.2d 880 (1989):
>
>> Particularly when the accused resides with the victim or has virtually unchecked access to the child, and the abuse has occurred on a regular basis and in a consistent manner over a prolonged period of time, the child may have no meaningful reference point of time or detail by which to distinguish one specific act from another. The more frequent and repetitive the abuse, the more likely it becomes that the victim will be unable to recall specific dates and

---

six-year-old son personal hygiene habits did not include placing his penis on top of his son's

penis, or placing his penis on his son's back.

places. Moreover because the molestation usually occurs outside the presence of witnesses, and often leaves no permanent physical evidence, the state's case rests on the testimony of a victim whose memory may be clouded by blur of abuse and a desire to forget.

*People v. Aldrich,* 849 P.2d 821, 826 (Colo.Ct. App.1992) (citation omitted) (quoting *State v. Brown,* 55 Wash.App. 738, 780 P.2d 880 (1989)). I believe that a child's inability to specifically remember every detail and date of an alleged assault should not form a basis on which to insulate a defendant from conviction.

This is best illustrated by the testimony of the minor in this case, who was six years old at the time the sexual abuse occurred. At trial, the minor testified to five separate acts of sexual penetration and at least two separate acts of sexual contact by his father. *See, supra,* note 3. On cross examination, the minor acknowledged that he told a detective from the Maui Police department that his father touched him approximately twelve times, however, at trial, he could only guess as to the number of specific instances because he had difficulty in remembering what had happened three years ago. One year before trial, the minor testified before the grand jury that his father inserted his finger into his butt "more than once"; inserted his penis into his butt "more than once"; put his mouth on his penis "more than once"; and placed his penis on the minor's penis "more than once." The divergence in the minor's testimony before the grand jury and trial regarding the number of times sexual penetration and sexual contact occurred makes clear the difficulty in charging a defendant with separate offenses based on the testimony of a child, when the sexual conduct is continuous and over a period of time. It also begs the question as to when several distinct acts of sexual abuse merge into and constitute a continuous course of conduct.

In weighing these competing interests with a defendant's due process rights, and in an attempt to remedy this predicament and ar-

bitrary line drawing, several jurisdictions have concluded that, under certain circumstances, sexual assault of a minor is a continuing offense. This allows the prosecution to base its charges on the testimony of the minor complainant, who is unable to recall with precision, the dates, instances, and other circumstances of the sexual acts committed by the defendant, without violating the defendant's due process right to be informed of the charges that he or she faces.

In *Huddleston v. State,* 695 P.2d 8 (Okla. Crim.App.1985), the complainant, a nine-year-old girl, was sexually assaulted by her father while visiting him over the Christmas holidays. The court held that "when a child of tender years is under the exclusive domination of one parent for a definite and certain period of time and submits to sexual acts at that parent's demand, the separate acts of abuse become one transaction[.]" *Id.* at 10–11.[4] There are obvious similarities between *Huddleston* and the present case. In this case, the complainant was six years old at the time his father allegedly committed the sexual assaults. These assaults occurred over a five-month period of time when he was under the exclusive control of his father. Moreover, although defendant was charged with two counts of sexual assault, he was charged with two separate degrees of the offense— one count was sexual assault in the first degree and one count was sexual assault in the third degree. Therefore, each class of prohibited acts constituted a single "transaction" for purposes of each charged degree of sexual assault.

In *State v. Clark,* 209 Mont. 473, 682 P.2d 1339 (1984), the defendant was charged with eight counts of sexual intercourse without consent. The twelve-year-old victim testified that her step-father had intercourse with her approximately forty times. The Montana Supreme Court observed that

[i]ncest generally involves a continuing course of sexual conduct between two family members within the family home. Incestuous conduct usually consists of a series of unlawful sexual contacts between an

4. The majority's criticism of *Huddleston* is short-sighted as it fails to address those concerns previously enumerated, particularly that a child may

have no meaningful reference point of time or detail by which to distinguish one specific act from another.

adult family member and a child. In these respects, sexual offenses committed against a minor by a parent or step-parent are distinguishable from rape cases involving adult victims and a single criminal event in unfamiliar surroundings. In addition, children are less likely to distinguish dates and times with specificity.

*Id.,* 682 P.2d at 1344. The Montana Supreme Court concluded that because the sexual assaults were based on one continuing act, the general charges filed against the defendant were as precise as possible under the circumstances. *Id.* at 1345.

Similarly, in *Cooks,* 446 Mich. 503, 521 N.W.2d 275, the defendant was convicted of one count of second-degree criminal sexual conduct based on three incidents of sexual penetration against a ten-year-old child. The victim was sexually assaulted on three occasions over a three day period, outside the presence of witnesses. The Michigan Supreme Court observed that "a specific unanimity instruction is not required in *all* cases in which more than one act is presented as evidence of the actus reus of a single criminal offense. The critical inquiry is whether either party has presented evidence that *materially* distinguishes any of the alleged multiple acts from the others." *Id.,* 521 N.W.2d at 279 (emphasis in the original) (footnote omitted). The court held that "the multiple acts alleged by the prosecutor were tantamount to a continuing course of conduct," thus, it concluded that an offense involving the sexual assault of a minor could be based on multiple alleged acts. *Id.* at 286.

In *State v. Spigarolo,* 210 Conn. 359, 556 A.2d 112 (1989), the defendant was charged with multiple counts of sexually assaulting his girlfriend's two minor children. Specifically, the defendant was charged with two counts of sexual assault in the second degree based on six specific acts of sexual assault.[5] The court held that the alternative acts were not conceptually distinct because "[t]he six specific acts ... involved subjecting the victims to either active or passive participation in sexual activity in a manner harmful to

their physical or moral health." *Id.,* 556 A.2d at 129. Accordingly, the court accepted the state's contention that the sexual assault acts were based on one continuing offense. *Id.* at 129. Likewise, in the present case, the minor testified to several acts of passive participation involving sexual activity with the defendant in a manner, which even the majority cannot dispute, were deleterious to his physical and moral health. As in *Spigarolo,* these acts are conceptually similar to the other acts that comprise each charged offense.

In determining whether a trial court should issue to the jury a specific unanimity instruction, the *Spigarolo* court adopted a two-prong test—originally set forth by the court in *United States v. Gipson,* 553 F.2d 453, 458–59 (5th Cir.1977)—and applied it to cases involving sexual assaults committed against minors. The Connecticut Supreme Court held that "a unanimity charge on a specific act is required if: (1) the alternative acts are *conceptually distinct* from each other; and (2) the state has presented supporting evidence on each alternative act." *Spigarolo,* 556 A.2d at 128 (citations omitted). (emphasis in original). The court opined that a specific unanimity instruction was unnecessary because the defendant committed a continuing offense, and, therefore, the alleged acts were not conceptually distinct. The court held that

> [t]he six specific acts ... involved subjecting the victims to either active or passive participation in sexual activity[.] Because the state was unable to specify with greater precision the times of the alleged incident, it necessarily proceeded under a theory that the defendant's conduct was in the nature of a continuing offense.... Under these circumstances, the acts specified in the counts were not conceptually distinct within the meaning of *Gipson.*

*Id.* at 129. (citations omitted) (brackets in original).

In a vast number of cases involving sexual assaults against minors, California courts have varied in their applications of a continu-

---

**5.** Because *Spigarolo* involved two victims, the defendant was charged with two counts of sexual assault in the second degree. One count was based on three acts committed against one victim, and the other count was based on three acts committed against the other victim.

ing conduct standard, or a standard based on specific acts. Consequently, in 1989, the California state legislature adopted a "continuing abuse of a child" statute [6] that provides specific guidelines in determining when sexual assault of a minor is a continuing offense.[7]

In *Higgins,* 9 Cal.App.4th 294, 11 Cal. Rptr.2d 694, the California Court of Appeals held the statute to be constitutional and rejected the defendant's claim that it violated his due process rights. The court reasoned that the defendant's due process rights were not violated because he was charged with one offense, rather than multiple offenses, and because the information contained a specific period of five and a half months that referred to the time span during which the alleged acts occurred. Similarly, in the present case, the defendant was charged with one offense per each degree of sexual assault that occurred during a specific period of five months.

Based on these cases, and in light of the fact that (1) the Hawai'i legislature, not this court, is charged with legislating policy interests of the citizens of Hawai'i, and (2) there is a need in this state of a statute similar to California's that sets forth parameters and defines the circumstances under which a sexual assault of a minor is deemed a continuing offense, I strongly urge the legislature to enact a continuing sexual abuse of a child statute. Such a statute would address the problems presented when a child is unable to specify the time, places and circumstances of each act.

As the Idaho Supreme Court stated in *State v. Rogers,* 48 Idaho 567, 283 P. 44, 45 (1929):

It would be a very weak rule of law that would permit a man to ravish a fifteen year old girl ... and then say in effect:

'You cannot convict me of this crime, as you did not guess the right date.'

For these reasons, I respectfully dissent.

---

**6.** California Penal Code § 288.5 provided impertinent part:

(a) Any person who either resides in the same home with the minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense, ... or three or more acts of lewd or lascivious conduct ...

with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child....

(b) To convict under this section the trier of fact, if a jury, need unanimously agree only that the requisite number of acts occurred[,] not on which acts constitute the requisite number.

**7.** The HPC does not contain a similar statute.